**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**ST. CLAIR LIME COMPANY, Respondent.**

**No. 7078.**

United States Court of Appeals Tenth Circuit.

March 12, 1963.

Rehearing Denied April 17, 1963.

Seymour Strongin, Washington, D. C. (Stuart Rothman, Dominick L. Manoli, Marcel Mallet-Prevost and Melvin J. Welles, Washington, D. C., with him on the brief), for petitioner.

Edward E. Soule, Oklahoma City, Okl. (Roy C. Lytle and Robert J. Emery, Oklahoma City, Okl., with him on the brief), for respondent.

Before MURRAH, Chief Judge, and PICKETT and LEWIS, Circuit Judges.

LEWIS, Circuit Judge.

The National Labor Relations Board petitions this court under Section 10(e)

of the National Labor Relations Act, 29 U.S.C.A. § 160(e), for enforcement of its order of October 24, 1961, directing the respondent to bargain with the United Cement Lime and Gypsum Workers International Union, AFL–CIO, and its Local Union No. 396 as the exclusive representative of all its employees; to desist from interfering with the employees in matters pertaining to unionization; to offer immediate and full reinstatement to position of all employees who were on strike on and after July 11, 1960; to make financial reparations for refusal to reinstate employees; and to post notice of the company's willingness to recognize the union and employees' rights.

In issuing its order the Board adopted the findings and recommendations of the trial examiner who concluded that the strike was precipitated by unfair labor practices by the employer within the meanings of Section 8(a) (5) [1] and that the employee was also guilty of post-strike violation of Section 8(a) (1) [2] of the Act.

Respondent urges that the Trial Examiner and the Board ignored uncontradicted testimony in concluding that the employer willfully avoided meeting the representatives of the employees in bargaining sessions and erred in determining that the strike was an unfair labor practice strike entitling the striking employees to unconditional reinstatement in their employment, Wheatland Electric Coop. v. National Labor Relations Board, 10 Cir., 208 F.2d 878. Further complaint is made that the Board erred in fact and in law in attributing other unfair practices to the respondent.

The union was certified by the Board to represent employees of St. Clair Lime Company on March 31, 1960. On April 21, 1960, a union officer, Webber, wrote to Homer Dunlap, managing partner of the company, submitting a proposed collective bargaining agreement and urging that negotiations begin at the "earliest possible date." Dunlap received the letter and forwarded it to his attorney but no reply was made to the letter. Dunlap became ill shortly thereafter and the attorney stated that he didn't see any particular urgency in responding because the union had taken three weeks before making the original contact.

On May 7, Webber telephoned Dunlap at his home and was told that he was not in; on May 9 he telephoned again to be told that Dunlap was at his office; finally, when he called the office, he was told that Dunlap was in the hospital. He then asked to have the company attorney contact him and left his telephone number. Receiving no response, Webber sent the following telegram:

"Certified receipt shows you received Local Union No. 396 letter of April 21 and enclosures for negotiations. Although request was made for earliest date possible to begin negotiations we have failed through repeated efforts on May 7th and 9th to contact you through your Oklahoma City office. Request was made that your attorney contact me if you were unavailable. I have heard nothing from your office. Have sent our representative to Sallisaw, Oklahoma, to forestall a walk out of your employees. I now again in order to avoid a strike at your plant request you immediately contact me at KE 4–2521 Dewey Oklahoma or Clyde Brock, No. 64 Motel Sallisaw, Oklahoma through person to person calls advising of an immediate date to begin negotiations."

To this wire company counsel replied, stating that Dunlap had been ill and that May 24 was the earliest possible meeting date. This offer was accepted, but on

---

1. 29 U.S.C.A. § 158(a) "It shall be an unfair labor practice for an employer—
   "(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159 (a) of this title."

2. 29 U.S.C.A. § 158(a) "It shall be an unfair labor practice for an employer—
   "(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title; * * *."

May 19 a union meeting was called by union representative Brock for the purpose of explaining the difficulties encountered in arrangements for negotiation meetings. A strike vote was taken and passed to provide the basis for a strike "in the event the company still stalled on negotiations."

Respondent urges that the evidence of delays prior to the first meeting on May 24, justified by the examiner's acceptance of Dunlap's illness as the cause and excuse for the failure to arrange an early meeting date, cf. American Laundry Machinery Company, 76 N.L.R.B. 981, cannot support the conclusion of the trial examiner that the respondent failed and refused to bargain in good faith, by:

"(1) its studied failure to meet with the Union within reasonable periods until May 24 as required by the Act; * * * "

Although the evidence of the whole record indicates that Dunlap was not incapacitated for the entire month which elapsed between the union's first request and the first meeting and further shows that he had given broad powers in these matters to his attorney, the inferences to be drawn concerning this period of time are equivocal and would not alone support the conclusion of a refusal to bargain in good faith. But the strike voted May 19 was never consummated and so the evidence of the company attitude prior to the first bargaining meeting only serves to elucidate the inferences drawn against the company in the conclusion of its failure to bargain in good faith by:

"(2) its failure to set a meeting date after June 29; * * * "

Negotiating meetings were held on May 24, June 9, and June 10. Very little was accomplished in these meetings. Agreement was reached only as to minor details and proposals for an increase in wages were positively rejected by the respondent. The concluding minutes of the June 10 meeting show:

"Mr. Casey asked if the company had any specific offer of a wage increase to make at this time and Mr. Dunlap replied 'No.'

"Mr. Casey asked if the company would agree to union shop and Mr. Dunlap replied 'No.' The same reply was given as to a question about checkoff.

"Mr. Casey asked about vacations and Mr. Dunlap proposed two weeks after a period of years, possibly five years.

"The union representatives stated that they would report back to their membership and would communicate with the company if further meetings were desired."

The evidence as to the attempts to resume negotiations after June 10 is in conflict. Dunlap denied ever hearing of Union Representative Brock's telephone calls. But Brock testified:

"I would first call his office and some of the time they would say he hadn't come into the office, that he was probably at home. I'd call his home, and they would say he was on his way to the office, and back and forth. I'd always leave word for him to call, and I'd never receive the call."

Finally, on June 28 or 29, Brock contacted Dunlap by telephone. There is conflict as to what was said in that conversation. Dunlap testified that Brock told him that he would call back on July 6 to learn the date that the company executives considered satisfactory for another meeting and he denied the statements attributed to him by Brock's testimony:

"In conversation, I told Mr. Dunlap, and I says, 'The people over there are getting anxious, and I don't know whether I'm going to be able to hold them in there very much longer or not if we don't meet, because it's been a long time, and they're really anxious for us to get something done.' He says, 'Well, I'm not going to have any more meetings like them last ones we had,' and I said, 'What do you mean,' and he

got louder and louder, and he said, 'violence, violence. I don't want any violence taking place,' and I said, 'I don't understand. There wasn't any violence in any of the meetings I've been in,' and he said, 'Well, you all put me in bed for three days with that violence,' and he said, 'Hell, I don't know if I'll ever meet with you again or not.' "

Brock interpreted this conversation as a retraction of the prior implied promise to contact the company attorney to set the date for a meeting and accordingly called a union meeting on July 7. At this meeting the membership voted to strike on July 11 if the company had not by that time made arrangements for a negotiations meeting.

On the other hand, Dunlap and his attorney testified that they discussed the next possible meeting date immediately following Brock's call and determined that the earliest date would be July 13. This information was not communicated to Brock because of his failure to call on July 6. According to Dunlap's testimony, Brock had stated that he could not be reached by telephone and that it would be necessary for him to make contact with Dunlap and had indicated the date July 6.

After the strike vote was passed, a committee of union members, employees of the company, called on respondent's superintendent to state that the strike would take place at 8:00 o'clock July 11, unless Dunlap would meet with them before that. Subsequently, the superintendent testified, he relayed Dunlap's message that he could not meet until July 13 to members of the committee, Casey and Dobbs.

Dunlap testified that Casey called him on July 8 or 9 to ask if he would meet with the union prior to the time voted for the strike. When Dunlap told him that his attorney would not be available until the 13th, Casey replied: "Mr. Dunlap, that's not good enough. I'm sorry." Casey, although called as a witness, was not questioned as to his receipt of knowledge that the company was willing to

meet in the near future or whether he conveyed that knowledge to other union members and officials.

Thus, respondent argues that the examiner and the Board failed to consider uncontroverted evidence in rendering the finding:

"Even if full credit were to be accorded to the claim of both counsel and Dunlap that the former would not be available until July 13 for negotiations, the Respondent's studied failure to communicate the fact to the employees' certified bargaining representative is conclusive evidence, in the opinion of the Trial Examiner, of intentional refusal to bargain in good faith."

We cannot agree that this evidence detracts from the weight of the substantiality of the evidence considered as a whole, 29 U.S.C.A. § 160. Clearly, the statutory requirement of bargaining in good faith was violated by a lack of conscientious cooperation and the adversaries each attempted to illustrate that the blame lay with the other. The evidence cited by respondent as being uncontroverted is merely one phase of management's theory which attempted to controvert the union's theory. The evidence was in conflict and resolved in the hearing before the examiner and accepted by the Board. " * * * [E]ven as to matters not requiring expertise a court may [not] displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*," Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456. The credibility of the witnesses and the inferences to be drawn from the evidence are primarily for the determination of the Board, N. L. R. B. v. Beatrice Foods Co., 10 Cir., 183 F.2d 726, and the power of review, regardless how broad, is by definition but a deterrent to unbridled administrative action, an assessment of the record rather than a new trial. The conclusion that the respondent failed and refused to bargain in

good faith is supported by substantial evidence throughout the record and will not be set aside on speculation that questionable actions on the part of the employer over a period of three months might be explained as misunderstandings or unfortunate coincidence.

[4] The strike began on July 11 and the plant was closed until October 4. On that date it was reopened with new employees replacing the striking union members and these new employees were paid a higher wage than had been formerly paid at the plant. The Board found that this was an unfair labor practice on the part of respondent. Pacific Gamble Robinson Co. v. N. L. R. B., 6 Cir., 186 F.2d 106 holds that an employer who does not precipitate a strike and hires replacements at a higher rate than formerly paid or offered the union does not commit an unfair labor practice and respondent contends that it relied upon this holding in hiring a new crew. However, it is obvious that the fact of unilateral wage increases or the replacing of union members on the job after negotiations have broken down must be considered in the light of the particular circumstances of the case to determine whether the employees were coerced or restrained in their rights under Section 7 of the Act, 29 U.S.C.A. § 157. Cf. N. L. R. B. v. Mackay Radio & Telegraph Co., 304 U.S. 333, 58 S.Ct. 904, 82 L.Ed. 1381 and N. L. R. B. v. Crompton-Highland Mills, Inc., 337 U.S. 217, 69 S.Ct. 960, 93 L.Ed. 1320; N. L. R. B. v. Katz, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230.

In the present case, the strike was brought on by the employer's refusal to bargain in good faith. The natural effect, and possibly the employer's desire, in hiring new employees at a wage increase which it refused to consider in negotiations with the union, was to interfere with the right of the employees to join a labor organization. Wheatland Electric Coop. v. N. L. R. B., 10 Cir., 208 F.2d 878; N. L. R. B. v. Rural Electric Company, 10 Cir., 296 F.2d 523. And this conclusion is further buttressed by evidence that the employer, through its plant manager and foreman, suggested to union member Casey that a plan of returning to work might be worked out if union representatives did not join the negotiations. Such encouragement was clearly a violation of the Act, Medo Photo Supply Corp. v. N. L. R. B., 321 U.S. 678, 64 S.Ct. 830, 88 L.Ed. 1007. In view of the entire record of subtle opposition to the organization of its employees, the respondent's attempted explanations of this persuasion as casual and uncontrolled by management does not negative a contrary conclusion.

The record contains substantial evidence of unfair labor practice on the part of respondent and the order of the Board will be enforced.