NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

SOUTHWESTERN PORCELAIN STEEL
CORPORATION, Respondent.

No. 7051.

United States Court of Appeals
Tenth Circuit.

May 23, 1963.

Rehearing Denied June 24, 1963.

Standau E. Weinbrecht, Washington, D. C. (Stuart Rothman, Dominick L. Manoli, Marcel Mallet-Prevost, and Melvin Pollack, Washington, D. C., on brief), for petitioner.

Harry M. Crowe, Jr., of Crowe, Thieman & Froeb, Tulsa, Okl. (Floyd L. Rheam, of Rheam & Noss, Tulsa, Okl., on brief), for respondent.

Before MURRAH, Chief Judge, and BREITENSTEIN and SETH, Circuit Judges.

MURRAH, Chief Judge.

The N. L. R. B. seeks enforcement of its order holding respondent in violation of § 8(a) (5) and (1) of the National Labor Relations Act, 29 U.S.C. § 158(a) (5) and (1), by refusing to bargain in good faith, thereby causing and prolonging an unfair labor practice strike; and, ordering respondent to grant unconditional reinstatement to the strikers, with make-whole pay. The order will be enforced.

■ At the outset, it is important to keep in mind that the issue is whether the respondent negotiated with the Union in a good faith effort to arrive at a mutually satisfactory collective bargaining contract, and not whether they actually struck a bargain. The law commands the parties to a labor dispute to bargain collectively, by meeting at "reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment * * * but such obligation does not compel either party to agree to a proposal or require the making of a concession." 29 U.S.C. § 158(a) (5) and (d). This means that the parties can bargain, even to an impasse on positions fairly maintained. Majure v. N. L. R. B., 5 Cir., 198 F.2d 735; N. L. R. B. v. United Clay Mines, Corp., 219 F.2d 120; Whites Uvalde Mines v. N. L. R. B., 5 Cir., 255 F.2d 564; and N. L. R. B. v. Herman Sausage Co., 5 Cir., 275 F.2d 229. But, they may not come to the bargaining table with a closed mind, i. e., a predetermined disposition not to bargain. N. L. R. B. v. Truitt, 351 U.S. 149, 76 S.Ct. 753, 100 L.Ed. 1027; Wheatland Electric Co-op. v. N. L. R. B., 10 Cir., 208 F.2d 878; and N. L. R. B. v. Herman Sausage Co., supra. Such an attitude frustrates the purpose of the act, and mocks the law.

■■ The question of good faith bargaining necessarily involves subjective considerations, that must be left to the inference drawing function of the Board, which has the "difficult and delicate responsibility" of balancing the conflicting legitimate interests of the parties. See:

Phelps Dodge Corp. v. N. L. R. B., 313 U.S. 177, 61 S.Ct. 845, 85 L.Ed. 1271; N. L. R. B. v. Truck Drivers Union No. 449, 353 U.S. 87, 77 S.Ct. 643, 1 L.Ed.2d 676; N. L. R. B. v. Insurance Agents Intern. Union AFL-CIO, 361 U.S. 477, 80 S.Ct. 419, 4 L.Ed.2d 454; N. L. R. B. v. Katz, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed. 2d 230; and Wheatland Electric Co-op. v. N. L. R. B., supra. On limited judicial review, the question is whether the Board acted within the appropriate sphere of its administrative power, i. e., See: Labor Board v. Insurance Agents, ibid, and whether its ultimate conclusions, in the exercise of that power, are grounded in relevant facts. See: Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456; N. L. R. B. v. Bear Brand Roofing Co., 10 Cir., 312 F.2d 616; N. L. R. B. v. St. Claire Lime Co., 10 Cir., 315 F.2d 224; and Wheatland Electric Co-op. v. N. L. R. B., supra. The respondent here resists this order on the ground that it is without foundation in fact. It says that this is simply a classical impasse case, as in Whites Uvalde Mines v. N. L. R. B., supra.

Respondent is a manufacturer of porcelain enamel signs and related products, in Sandsprings, Oklahoma. As the result of a representation election in April, 1960, the United Steelworkers of America was designated, by a majority of respondent's employees, as their bargaining representative. According to the credited testimony of a former supervisor, a day or two after the election, respondent's President stated to him, "Well, they won the election but now they've got to get a contract." And later the same day, said, "The boys have won the election, but that didn't mean that they were going to get a contract" because he was under no obligation whatsoever to sign a contract and that he would "negotiate their _____ off if that's what they want." Shortly after the election, the Union presented to the Company a proposed contract, complete except for wage schedules, on which the Union needed additional information from the Company, concerning classifica-

tions and existing schedules, in order to formulate its demands. Among other things, this contract called for Union security, dues check-off, and a grievance procedure, including arbitration. After securing the vital wage information, the Union demanded a 25 cent general wage increase and a correction of "inequities" in the wage scale, between employees doing the same work.

After receipt of the Union's proposal, the Company requested a delay until June 3rd or 6th for the first meeting, due to the absence of a Company representative on vacation. The Union finally acquiesced, and the first meeting was held on June 6th. Between that date and August 1st, the parties met nine times. The negotiations chiefly consisted of going through the Union's proposed contract, and discussing its terms, including wages. When the Company refused to agree to the approximately $60,000 per year wage increase, the Union countered with a demand for an overall 25 cent increase, to be divided between a correction of the "inequities" between employees and a general increase. The Company made a counter proposal, offering to give up to 15 cents, for the purpose of equalizing the inequitable rates for similar work, but rejected the general increase. The estimated cost of this plan was approximately $13,000, and would allow the Company to determine who would receive the increases. The Union responded with a proposal calling for $20,000, to be divided between a general increase and correction of the "inequities." The Company representatives indicated that they would have to discuss this proposal with managment, and bargaining on the subject of wages was, thereupon, suspended.

As to other terms of the Union's proposal, the evidence discloses that the Union made concessions concerning number of holidays, probationary periods for new workers, trial periods on job transfers, garnishments on employees' wages, and loss of seniority. The Company agreed to such items as bulletin boards and equal pay for female employees, but while agreeing "in substance" or in "principle" to various other terms, would come to no definite agreement.

As of August 1st, little or no progress had been made on a contract. According to credited testimony, the Company asked the Union negotiator on that date, if the employees were going to strike. He replied that a meeting of the employees had been called for that night, and that he hoped to have a favorable report to make concerning the negotiations, but that it seemed to him that the Company was "not trying to bargain a contract at all." He explained that, after nine meetings, the Company had not made a single proposal, except for wages and job vacancies. At this point, the Company representative produced a proposed contract, and gave it to the Union. This contract provided for recognition of the Union as the bargaining agent of the employees, for payment of time and one-half for all hours worked in excess of 40 in one week, and that the Company would not interfere with, restrain or coerce employees, in their exercise of Union activities or discriminate against them. In addition, it contained a very broad Functions And Prerogatives Of Management clause, giving the respondent complete control over such items as merit increases, discharges, leaves of absence, promotions, transfers, reductions in force, new jobs, shift preferences, and job bidding. It also contained a grievance procedure clause, providing that in the event of an unsettled labor dispute, either the Union or the Company could terminate the contract. This proposal also contained an Article on Wages, but as far as we can determine, it offered nothing but the lump sum, for the purpose of adjusting "inequities," which had already been proposed, and rejected by the Union. No further progress was made at this meeting, and the Company representatives left early, to prepare for the possible strike. The next day, the employees struck, and the respondent continued operating the plant by hiring replacements.

After the strike began, respondent could not rely on its usual practice of on-the-job training, to develop needed skills, and resorted to hiring, in skilled classifications, at or near the top rates for those classifications. It also hired general laborers at a higher rate than it had been paying, prior to the strike.

Bargaining was resumed on August 24th, with a member of the Federal Mediation and Conciliation Service present. At this meeting, respondent's representative stated that, because the Union went on strike, he assumed that it was rejecting the Company's proposal, and thereupon withdrew it. The Union negotiator suggested that the Company proposal bore no resemblance to a contract on matters of wages, hours, or working conditions; that he thought it had no force and effect, or authority for settling disputes, and provided nothing other than a fundamental right to terminate the contract. At this point, the Conciliator stated: "I would say you people are not bargaining."[1] He then suggested that some headway might be made by using the Company's proposal, as a basis for the negotiations. The Company representative stated, however, "Well, I think we could use it as a basis for the negotiation, but there are some other things that we're going to ask for besides this now, that did not exist at the time that this proposal was made."

Four subsequent meetings were held. Acting under the suggestion of the Conciliator, the Union submitted a new proposal, with all of its prior concessions, but retaining Union security, dues check-off, and a grievance procedure, including arbitration. The Company maintained its attitude of agreeing in principle without commitment to terms, and offered no further proposals. Meetings were, thereupon, suspended to await the outcome of this unfair labor practice complaint.

The complaint of bad faith bargaining was based upon four specific charges:

(1) Causing unreasonable delays in scheduling meetings and engaging in surface bargaining.

(2) Presenting a wage proposal of a definite lump sum for the purpose of adjusting inequities, but reserving to itself selection of the individuals to be adjusted.

(3) A proposed grievance clause, providing that if either side used it, the contract might be set aside.

(4) Entering into unilateral changes in rates of pay applicable, particularly, but not exclusively, to new employees.

The trial Examiner did not stop to consider whether any one of the four charges, standing alone, was legally sufficient to constitute a § 8(a) (5) violation, or for that matter, whether the proof in support of each was sufficient to sustain the charge. Instead, the Examiner looked at the "over-all evidence," from which he gained the "distinct impression" that the "respondent was determined not to concede anything * * * if it might have any possibility, whatsoever, of resulting in a contract." He thought that the respondent's repeated insistence on reviewing contract verbiage, on matters as to which it had agreed in principle, and its failure to make positive and constructive suggestions concerning the wording of the contract "was indicative of deliberate stalling to avoid any chance of having an accumulation of accords, which might conceivably result in a complete contract." The Examiner also attached significance to respondent's expressed intention, at the August 24th meeting with the Conciliator, to seek increased concessions over its previous proposals, which in

---

1. Mr. Walker stated, "The Union has come up with a proposal that was not satisfactory to management. Management brought a proposal in that was not satisfactory to the union. Management has now withdrawn its proposal and you have not talked on anything else except the proposal that has been withdrawn. In my opinion, that is the flimsiest kind of bargaining * * *."

the first instance, offered nothing of substance.

The Board's conclusions, with respect to the unfair labor practice strike, are necessarily based upon respondent's conduct prior to the strike, and respondent earnestly insists that the pre-strike evidence is entirely insufficient to support a conclusion of bad faith bargaining; that good faith negotiations had broken down; that the parties had reached an impasse, resulting in an economic strike; and, that any post-strike, unilateral changes in wages or conditions of employment, or other evidence of conduct, are wholly irrelevant to the vital issue in this case.

The Examiner did not regard the wage changes made, with respect to procurement of skilled classifications after the strike began, as necessarily demonstrating bad faith. Nor, did the Examiner or the Board regard the post-strike unilateral changes in rates of pay to general laborers, as a per se violation of § 8(a) (5), as in N. L. R. B. v. Katz, supra. The Examiner concluded, however, that the post-strike unilateral changes in the rates of pay for general laborers, was evidence of bad faith, and served to strengthen the position of the respondent and correspondingly weaken the position of the Union, thus prolonging the unfair labor practice strike, as in Wheatland Electric Co-op. v. N. L. R. B., supra.

The Board has found and concluded that the respondent's pre-strike conduct is indicative of a disposition not to bargain in good faith, but to merely go through the motions, as in Wheatland Electric Co-op. v. N. L. R. B., supra; and N. L. R. B. v. St. Claire Lime Co., supra, and that such conduct was an unfair labor practice, which provoked the strike. The conclusions of the Board, based as they are upon subjective inferences drawn from a course of conduct, by which we ultimately judge a state of mind, are arguable and certainly not free from doubt. When, however, they are judged in the light of the vital importance of good faith bargaining in the effectuation of the basic purposes of the Act, and the "difficult and delicate" responsibility of the Board, in balancing the conflicting interests of the parties in the whole collective bargaining process, we cannot say that the Board's conclusions are unjustified.

Finally, the respondent attacks the Board's back-pay order, on the premise that even though the strike was brought on by its unfair labor practice, its general letter to the employees,[2] im-

2.         "Respondent's Exhibit 5
                    "August 2, 1960
"Dear Employee and Family:
"The Steelworkers Union has called a strike and are picketing at our plant. As an employee you have a right to honor or to participate in that activity. You have an Equal right, namely, the right of crossing the picket line and working.

"Your Company has certain rights, one of which is to continue operating its plant. This We Intend To Do. We prefer to do this with the help of our regular employees and for that reason we are requesting that you return to your job Immediately.

"If you have not returned to your job at the beginning of your regular work shift on Monday, August 8th, 1960, we shall hire a replacement to fill the job which you have left vacant.

"If you refuse to return to work you will continue to be one of our employees but you will not be on the payroll. The Company is under no obligation to dis-

charge the person employed to fill the vacancy left by you in order to put you back to work. If the replacement has been hired you will not be put back on your job until such time as there is a vacancy in said job.

"There is a rumor going around to the effect that those who cross the picket line and continue to work will be blackballed, and if, as, and when the Union gets a contract, those employees crossing the picket line and continuing to work will lose their job. There Is No Truth To This Rumor. No employee is going to lose his job with the Company for having crossed the picket line.

"We trust that you will report to work immediately.
                    "Yours very truly,
                    Southwestern Porcelain
                    Steel Corporation
                    By C. F. Maroney,
                                        President
                    By W. C. Russell,
                        Secretary-Treasurer"

mediately after the strike, was an unconditional offer of reinstatement on that date, and upon rejection, the respondent was thereafter exonerated from the duty to again offer reinstatement with backpay. The effect of this argument is to treat the letter as if it were addressed to economic and not unfair-labor-practice-strikers. Cf. Kansas Milling Co. v. N. L. R. B., 10 Cir., 185 F.2d 413. In the view we take of the case, however, the letter served only as a device for breaking the unfair labor practice strike, by exhorting the strikers to return to work, on penalty of losing their jobs. It is fundamental that "an employer may not lawfully demand, as a condition precedent to the performance of his statutory duty (i. e., to bargain in good faith), an abandonment by employees of protected, concerted activities or a surrender of rights bestowed by the Act." N. L. R. B. v. Pecheur Lozenge Co., 2 Cir., 209 F.2d 393, 403.

The order is enforced.