NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

UNITED NUCLEAR CORPORATION,
Respondent.

No. 8887.

United States Court of Appeals
Tenth Circuit.

Aug. 23, 1967.

Gregory L. Hellrung, Washington, D. C. (Arnold Ordman, Dominick L. Manoli, and Glen M. Bendixsen, Washington, D. C., on brief), for petitioner.

George H. Cohen, Washington, D. C., for intervenor.

Leonard L. Pickering, Albuquerque, N. M., for respondent.

Before MURRAH, Chief Judge, and PICKETT and HICKEY, Circuit Judges.

MURRAH, Chief Judge.

This is an unfair labor practice proceeding in which the trial examiner found that the employer violated Secs. 8(a) (5) and (1) by refusing to engage in good faith bargaining from and after August 18, 1964, and by unilaterally laying off about 40 employees ten days later; he also found an 8(a) (1) violation in coercive anti-union remarks of supervisors uttered in July of 1964. The Board agreed with these findings, but it did not stop there. On the basis of the same record, it found that the refusal to bargain dated from March 29, 1964; it also found 8(a) (5) and (1) violations in the employer's unilateral discontinuance of severance pay and the established grievance procedure in late August of 1964. The employer was ordered to cease and desist from the unfair labor practices, to bargain upon request, to post notices, and to make whole the laid off employees by paying each of them the amount he would have received as severance pay with interest. We enforce the order.

The relevant background facts are that in June of 1962, the union [1] negotiated a contract with Phillips Petroleum Company covering the employees at its Sandstone and Cliffside uranium mines, both of which are located near Grants, New Mexico. Thereafter, the respondent employer, United Nuclear Corporation, purchased these two mines, and entered into a supplemental agreement with the union by which it agreed to be bound by the terms of the union-Phillips contract. This contract was due to expire May 31, 1964, and in late March of that year, Nuclear wrote the union giving notice of termination of the contract on its expiration date.

On March 29, the union wrote Nuclear stating its intention to negotiate a new contract and requesting Nuclear to set a date to begin negotiations. No response was forthcoming, and on May 1, Nuclear was informed that unless arrangements for negotiations were made, the union would file refusal to bargain charges. After some further communications the parties held an exploratory meeting on May 11. Various matters were discussed, including the ore stockpiles, Nuclear's ability to withstand a strike, the "breaking in" of salaried personnel to operate hoists and pumps in the event of a shutdown, and Nuclear's position that it "would rather not deal with the union". The union reiterated its desire to negotiate, and again stated that if negotiation arrangements were not forthcoming it would file refusal to bargain charges. The next day the union was notified that a meeting was set for May 25.

No negotiations were held at the May 25 meeting. Instead Nuclear for the first time informed the union that it doubted whether the union still represented a majority of the employees. It stated that it based this doubt on information that an employee had filed a decertification petition with the Board,[2] that more than 50 percent of the employees had signed the supporting petition, and that still others wanted to sign but were dissuaded by fears of union reprisal. The union questioned the company's doubt, pointing out that 150 of the 170 employees had signed dues checkoff authorizations as of May 9. Nuclear then suggested a consent election with working conditions to remain unchanged in the interim between expiration of the contract and the election. The union refused saying that Nuclear's own records indicated the union still held a majority, and that an election was unnecessary. The next day the union filed unfair labor practice charges. On June 12, the company filed a decertification petition; a few days later the union

1. United Steelworkers of America, AFL-CIO, and Local Union No. 5605, United Steelworkers of America, AFL-CIO.

2. An employee had filed a decertification petition on May 24, but it was rejected by the Regional Director because the collective bargaining agreement was still in effect. He refiled the petition on June 2, but it was dismissed because the signatures were undated. He did not refile the petition.

withdrew its charges, and on June 23 agreed to a July 31 consent election.

Thereafter and during the month of July, Nuclear supervisors engaged in the conduct found by the Board to be coercive and thus violative of 8(a) (1). It should also be noted that during this period Nuclear by letters to its employees set forth its strong anti-union position.[3]

Notwithstanding Nuclear's July activities, the union won the election by a wide margin, and the parties met on August 18 to negotiate. They discussed the various items in the old contract, and the Union offered to accept the terms of the old contract without change. Nuclear refused, and made clear its intention never to agree to a contract containing severance or layoff pay, unavoidable absence, check-off and eight paid holiday provisions, all of which had been included in the old contract. During the course of the meeting a Nuclear vice-president announced that a decision had been made to lay off up to 50 percent of the employees without severance pay. The union requested details concerning the date of the layoff, and the number and identity of employees who would be affected. Nuclear replied that this information was not available since those decisions had not yet been made.

The parties met again the next day, and at this time the company made its contract offer. This offer omitted provisions for union security and check-off, severance and layoff pay, wage increase and other benefits contained in the old contract. It included a new management prerogative clause. The meeting ended with no agreement.

A few days later on about August 21, the president of the local union requested a list of the employees to be laid off. The Cliffside Superintendent agreed to provide it. But no list was supplied before August 28 when Nuclear implemented the layoff. When the local president asked for the list of men who had been laid off, he was told it would not be available until August 31. The list was finally provided on that date. Also on that date, and on the following two days, the union filed some fifteen grievances with the Cliffside Superintendent, all relating to Nuclear's asserted failure to follow seniority as a basis for the layoff, or to pay severance pay. These grievances were transmitted to Nuclear's general manager who, in response to inquiry from the union grievance committee chairman, stated that he didn't know what he would do with them; that there was no contract in existence, but that

---

3. The most striking example is the company's letter of July 29 in which it stated the following:

"The threat of a strike then or now does not bother the Company whatsoever. In fact the Company would have benefited and still would if the Union pulled one. Gentlemen, you have been working without a Union contract for almost two months so you know how you are treated without having a Union or a Union contract.

"I want to make myself clear that the Company is not afraid of a strike. * * *

"If we were forced to shut these mines down my Company would benefit. * * *

"We know that the Union always insists on a check-off and Union security clause. We know this is the most important thing to the Union from their standpoint.

"As a matter of principle the Company does not believe in forcing its em-

ployees to join and pay the Union, neither does the Company believe in acting as a collection agent for the Union. We have no intention, even if a Union is voted back in, of ever agreeing to any Union security or check off clauses. We also believe that the Union would make you go on strike before they would agree to any contract without any check off or Union security clauses. *Thus we feel that if a Union is voted back in our employees would definitely be called out on a strike before very long.* It is for this reason I felt you should know our position and theirs before you vote. That the Company would not be hurt but benefit by a strike. However we are interested in our employees welfare and do not want to see them hurt and have to suffer a strike. Therefore I want to personally ask you to vote against the Union and any strikes." (Emphasis theirs.)

he did feel an obligation "to take care of these grievances." On September 3, the union filed the charges which form the basis for these proceedings. Another negotiation meeting was held September 10, and others thereafter, but as of November 16, no agreement had been reached on any of the major issues.

We first consider the findings of threatening and coercive statements violative of 8(a) (1). The statements were found to have been made by three supervisors to at least five employees at various times during the month of July. Nuclear's contention is that the statements were not uttered in the form and content found. It concedes the question is one of credibility, but says the trial examiner was biased and we need not therefore attach the customary weight to his credibility judgments. But we find no bias. That the trial examiner largely believed general counsel's witnesses and disbelieved Nuclear's witnesses does not necessarily indicate bias. See NLRB v. Pittsburgh S. S. Co., 337 U.S. 656, 69 S.Ct. 1283, 93 L.Ed. 1602. The trial examiner set out in detail his reasons for believing general counsel's witnesses on this point, and we find nothing in their testimony or in the whole record which requires us to discredit the trial examiner's credibility judgments.

Turning to the 8(a) (5) and (1) violations based on asserted unilateral actions by Nuclear, it is established that unilateral changes in working conditions which are the mandatory subject of collective bargaining are violations of the Act. See NLRB v. Katz, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230; American Sanitary Products Co. v. NLRB, 382 F.2d 53. (10 CA). And this is so regardless of the good faith of the employer. NLRB v. Katz, supra, 369 U.S. p. 743, 82 S.Ct. 1107. However, if the union is afforded a reasonable opportunity to bargain concerning the proposed change, see NLRB v. Brown-Dunkin Co., 10 Cir., 287 F.2d 17, or if they negotiate the proposed change to the point of impasse, see NLRB v.

Crompton-Highland Mills, 337 U.S. 217, 69 S.Ct. 960, 93 L.Ed. 1320, the employer may lawfully take the proposed action.

As to the layoffs and termination of severance pay, Nuclear's position is clear. It says that at the August 18 meeting it notified the union of the impending layoffs and that the employees would not receive severance pay. It points to the following testimony by Frantz, an official of the international, and argues that by it the union consented to the proposed layoffs:

"A. During the course of this meeting, Mr. Buchecker did advise the Union that there was going to be a layoff, and he went into details as to why there was going to be a layoff. He went into detail that the stockpile was such, and that finances of the Company—that the Chase Manhattan Bank had made it so that there had to be a layoff. And I think I expressed my regret to hear that anybody is going to be laid off, but I know that, I think I expressed it to the Company, 'You people have the management of the mine, it is certainly up to you and you know what you have to do.' "

"Q. Why didn't you ask him to talk about it, why didn't you ask to discuss it? A. There wasn't—it wasn't any of my business. * * It wasn't any of my business, because that is strictly a management prerogative."

"Q. * * * Laying off employees? A. That's correct."

Further it points to its August 19 contract offer which omitted layoff or severance pay, and says the parties were at an impasse on that issue. Finally, it notes that at no time after August 19 did the union seek to bargain on either of these issues.

The trial examiner found that Nuclear "failed to meet its statutory obligation to notify and consult with the union" concerning its layoff decision; that the

vice-president's statement of August 18 was too casual and vaguely worded to be significant; that it amounted to no more than a statement of intention to lay off an unknown number of employees at an unknown future date; and that the number and identity of employees to be affected were concealed from the union until after the decision had been made and carried out. The Board adopted these findings, and also found that Nuclear "during ostensible collective-bargaining negotiations with the Union, but without reaching a genuine impasse or securing the Union's consent" unlawfully terminated severance pay.

■ On the layoff issue it is apparent that the violation is founded not in the unilateral decision of the necessity for a layoff but rather in the unilateral decision as to when it would occur and the number and identity of the affected employees. It must be conceded that Frantz' testimony, if credited, constitutes a union concurrence in the necessity for a layoff. The decisive question is whether, in the circumstances, it also must be read to state the union's consent to Nuclear's decision (which had not yet then been made) on the all-important details of the layoff. As to that, we are somewhat in the dark, for neither the trial examiner nor the Board analyzed or mentioned this testimony. But since a violation was found, we can assume the Board did not infer from Frantz' statement a consent to all details of the layoff, and the question on review is whether substantial evidence supports the Board's refusal to draw that inference. We are satisfied that it does. The record is clear that from August 18 on, the union sought information concerning the details of the layoff; that Nuclear promised this information when it became available; and that the union was then kept in the dark until the layoff had been carried out. We think the Board was justified in inferring from this that the union desired to negotiate concerning which employees would be laid off and when; to reject Frantz' testimony as a blanket union consent to any details

of the layoff which the company might arrive at; and to conclude that Nuclear denied the union the opportunity to negotiate those details in violation of the Act. See NLRB v. Brown-Dunkin Co., supra; NLRB v. Exchange Parts Co., 5 Cir., 339 F.2d 829.

■ As to the unilateral discontinuance of severance pay we think the Board's finding that no impasse existed is clearly supported by substantial evidence. Although Nuclear indicated on August 18 an indisposition toward inclusion of a severance pay provision in the new contract, this was not couched in terms of a contract offer until August 19, the day on which Nuclear says the parties reached an impasse. We think that the Board could certainly find that the union's refusal of this offer on the same day it was made did not produce an impasse. Cf. NLRB v. Herman Sausage Co., Inc., 5 Cir., 275 F.2d 229.

We now reach the third of the specific 8(a) (5) and (1) violations—the unilateral change in the established grievance procedure. Under the old contract, grievances were first considered by the general manager who rendered a written decision within five days. If this decision was unsatisfactory, the grievance was "ironed out" at a meeting attended by the general manager, union grievance committee and international representative. These meetings were held at irregular intervals and disposed of all grievances accumulated up to the time of the meeting. The Board's finding of a violation is based on the trial examiner's finding to the effect that after expiration of the contract, and especially with respect to the fifteen grievances filed on August 31 and September 1 and 2, Nuclear, through its general manager or superintendent, dealt directly with grievants without notice to the union or the presence of the union grievance committee.

■ Nuclear's position is that the established procedure was not altered. It points out, as we have noted, that the fifteen grievances were forwarded to the general manager in accordance with the

established procedure. And, it contends that Nuclear offered to discuss the subject grievances at the September 10 negotiation meeting. This contention cannot prevail. In the first place, as pointed out by the union officials at that meeting, the purpose of the meeting was negotiation of a new contract, not disposition of grievances which were by then the subject of unfair labor practice charges. Moreover, according to the testimony of Frantz, the union grievance committee was not present at the negotiation meeting.[4] But finally and most importantly, the company cannot prevail because it has, in substance, admitted effecting the unilateral change found by the Board. The following excerpt is taken from a letter written on October 8 by Nuclear's counsel to the Board:

"With reference to the handling of grievances, the Company's position is and has been, since expiration of the Union contract on May 31st of this year, that there has not been any formal grievance procedure. During this time, both before and after the Union election involving the Sandstone and Cliffside mine employees, the Company has expressed a willingness and has handled grievances upon an informal basis whereby the employee or employees were free to discuss their grievances with their immediate supervisors, the mine Superintendent, or the General Manager * * *. Many employees have discussed their grievances with their supervisors and also with [the General Manager]. They have been looked into and handled upon this basis. * * * "

The Board's finding of a unilateral change in the grievance procedure is supported by substantial evidence. See Industrial Union of Marine and Shipbuilding Workers of America, AFL–CIO v. NLRB, 3 Cir., 320 F.2d 615.

The final question is whether there is substantial evidence in the record to support the Board's finding of a general refusal to bargain from and after March 29. We must first, however, decide the threshold issue whether Nuclear was denied due process because no such refusal to bargain was alleged in the complaint. The complaint alleged that the bargaining violation consisted of various unilateral actions commencing on or about June 1, 1964, and Nuclear says that being found guilty of an unlawful refusal to bargain from and after March 29 is "similar to being charged and tried for a misdemeanor and then found guilty of murder." Prime reliance is placed on NLRB v. Bradley Washfountain Co., 7 Cir., 192 F.2d 144.

■ But we think the facts of our case distinguish it from Bradley Washfountain. At the outset of the hearing, Nuclear's counsel raised the issue of the scope of the complaint, and an extended colloquy ensued ending as follows:

"Trial Examiner: As I read the Complaint, maybe I'm wrong and I'm going to ask counsel for the General Counsel, are you contending that since March 29, 1964, that there has been a refusal to bargain as you allege in Paragraph 12 of your Complaint?

Mr. Maydanis (Counsel for the General Counsel): Counsel for the General Counsel is prepared to prove that there has been a refusal to bargain from the date of March 29, 1964.

Trial Examiner: All right.

Mr. Pickering (Nuclear's counsel): And that this has been a continuous refusal to bargain?

Mr. Maydanis: And that this has been a continuous refusal to bargain. Down to the issuance of the complaint and thereafter."

The Board took note of this exchange and found that Nuclear did not object to the admission of evidence to show a pre-June 1 refusal to bargain, but instead introduced evidence itself on the

---

4. Frantz did admit on cross-examination that one or two of the members of the grievance committee were also members of the negotiating committee and were present at the September 10 meeting.

point. It concluded that Nuclear "was fully aware that the alleged refusal to bargain commenced on March 29, 1964, and was not limited to conduct since since June 1, 1964", and we agree. "The respondents were fully apprised of the matters in issue and they were all litigated." NLRB v. Broderick Wood Products Co., 10 Cir., 261 F.2d 548, 559. Cf. NLRB v. Jordan Bus Co. and Denco Bus Lines, Inc., 380 F.2d 219, May 1967 term.

We now turn to the merits. Fully a month passed after the union's March 29 bargaining demand without Nuclear making any response, and on May 1, the union threatened to bring charges if negotiations were not initiated. After the May 11 exploratory meeting at which Nuclear expressed its hostile attitude toward the union, the parties met at the May 25 meeting, at which Nuclear for the first time asserted a good faith doubt of the union's majority. In support of its asserted good faith, Nuclear points to the testimony of one of its officials to the effect that he stated at the May 25 meeting that if the union would agree to an election, the company would negotiate on the understanding that any contract arrived at would be subject to the outcome of the election. But Nuclear completely ignores the trial examiner's express finding in which he discredits the testimony of this Nuclear official for the reason that union official Frantz denied that such an offer was made and that Nuclear's general manager made no mention of the offer in his testimony.

The union finally agreed to a consent election only to be subjected to an anti-union campaign by Nuclear supervisors. Such conduct we have recently noted is cogent, if not conclusive, evidence of a lack of good faith. See Furr's Inc. v. NLRB, 10 Cir., 381 F.2d 562, January 1967 term; American Sanitary Products Co. v. NLRB, supra. Nuclear's letter of July 29, see footnote 3, supra, in which it predicted a strike is also evidence of a lack of good faith doubt.

To recapitulate, the union won the election and the parties met August 18 and 19 to negotiate. Nuclear's offer omitted many benefits included in the old contract, provided for no wage increase and included a new management prerogative clause. Nuclear then proceeded to engage in unilateral changes in working conditions. Finally, even at the meetings held after the union filed unfair labor practice charges on September 3, it seems apparent that Nuclear was more interested in learning the content of those charges than in engaging in serious bargaining.

The law is clear that while the parties are not bound to agree, " * * * they may not come to the bargaining table with a closed mind, i. e., a predetermined disposition not to bargain." NLRB v. Southwestern Porcelain Steel Corp., 317 F.2d 527; see also NLRB v. W. R. Hall Distributor, 341 F. 2d 359. The trial examiner found that Nuclear " * * * entered into negotiations with a mind hermetically sealed against even the thought of entering into an agreement with the union * * * ", and found a refusal to bargain dating from August 18. The Board adopted this finding, and found further that Nuclear had refused to bargain from and after March 29. We think the narrated facts provide substantial support for these findings.

One final matter deserves some comment. Nuclear suggests that the Board's order requiring it to pay severance pay amounts to an extension of the expired contract, and the granting of a remedy for its breach which the Board is without authority to do. See Ass'n of Westinghouse Salaried Employees v. Westinghouse Electric Corp., 348 U.S. 437, 75 S.Ct. 488, 99 L.Ed. 510. As to that, it is sufficient to note that the severance pay order was entered not to enforce the contract but instead to remedy the employer's unilateral discontinuance of an existing condition of employment, i. e. severance pay. See Overnite Transportation Co. v. NLRB, 372 F.2d 765; NLRB v. Frontier Homes Corp.,

371 F.2d 974. To quote Overnite Transportation Co. v. NLRB, supra (372 F.2d p. 770), "Because the relation of remedy to policy is peculiarly a matter for administrative competence, the task of devising remedies to effectuate the policies of the Labor Act is that of the Board. Even orders making necessary a restoration by way of back pay should stand unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act."

The order will be enforced.