NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

RALPH PRINTING & LITHOGRAPHING COMPANY, Respondent.

No. 18570.

United States Court of Appeals, Eighth Circuit.

Sept. 25, 1970.

Rehearing Denied Oct. 29, 1970.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

———◆———

Paul Elkind, Atty., National Labor Relations Board, Washington, D. C., for petitioner, and filed brief; Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and William H. Carder, Washington, D. C., Atty., on the brief.

William A. Harding, Lincoln, Neb., for respondent, and filed brief; Mr. Charles J. Kimball, Lincoln, Neb., on the brief.

Before BLACKMUN,* MEHAFFY and BRIGHT, Circuit Judges.

MEHAFFY, Circuit Judge.

The National Labor Relations Board has petitioned this court to adjudicate respondent, Ralph Printing & Lithographing Company, in civil contempt for allegedly failing and refusing to comply with the decree of the court entered July 6, 1967 in NLRB v. Ralph Printing & Lithographing Co., 379 F.2d 687 (8th Cir. 1967), which granted enforcement of the Board's order in Ralph Printing & Lithographing Co., 158 NLRB No. 128, 62 LRRM 1233, as modified. The Company was ordered to recognize and bargain collectively with the Lithographers and Photoengravers International Union, AFL–CIO, and to cease and desist from interfering with the employees' self-organizational rights.

When the petition was filed alleging that the Company had not complied with the decree and asking that it be adjudged in contempt, the matter was referred to a Special Master, The Honorable Robert Van Pelt, to conduct a hearing and report to this court his findings of fact, conclusions of law and recommendations. On October 2, 1969 the Special Master issued his report stating that it was his recommended conclusion that the Company has violated both the letter and intent of the decree in that it bargained in bad faith, refused to execute the contract when agreement had been reached even though the Company's negotiator had the authority to do so, and granted wage increases to certain employees during a period when the Union was the collective bargaining agent and when contract negotiations were in progress, all in violation of the decree. We adopt the findings and recommended conclusion of the Special Master as summarized below.

On October 3, 1967 the parties commenced bargaining. The Company was represented throughout the negotiations solely by attorney John E. Tate, and the Union was represented by various Union officials and employees including Mel Galbraith, a representative of the International Union, and Dale Bahn, President of the Local Union. At all times during the negotiations the Company fully cooperated with the Union with respect to fixing times and places for negotiation and furnishing information desired by the Union. On March 5, 1968, while negotiations were in progress, the Union caused an unfair labor practice charge to be filed against the Company alleging that it had improperly granted pay raises and had refused to bargain over job classification. On March 6, 1968 a bargaining session was held after which only three issues were left in dispute, the vacations clause, holidays clause and job classification. Immediately after the meeting the employees voted to drop their demands on these items and accept the contract.

The following morning, March 7, 1968, the Union negotiator obtained authority from International to accept the contract without these clauses and to sign the contract without further International approval. On the same date the Union's negotiator called Tate's office and asked his secretary to inform Tate that the Union was ready to sign a final contract

---

* Mr. Justice Blackmun, who sat on this panel as a member of this court before his elevation to the United States Supreme Court, did not participate in the consideration or decision of this case.

incorporating only those provisions already agreed upon. He wrote Tate to the same effect on March 12, 1968 and, in Tate's reply, he complained about the unfair labor practice charge and stated that he had no idea what the Union's negotiator was talking about. On March 20, 1968 Tate was again contacted and responded that he would draft a completed contract embodying the agreed-upon terms by March 28, 1968. This was done and a copy was sent by Tate's office to the Union and also to the President of the Company, Joe Peer, advising that it was a final agreement. Tate also talked with Clifton Batchelder, the owner of the Company, concerning it.

On April 2, 1968 the Union negotiators met with Tate for the agreed purpose of executing the contract. They went through it and made a number of minor changes in the wording and initialed these changes. Thereafter the Union negotiators signed the contract and presented it to Tate who informed them for the first time that he did not have the authority to sign it but would submit it to Batchelder and give the Union an answer in forty-eight hours. The Company subsequently refused to sign the agreement as written and an attempt was made to bargain further. After several meetings Tate sent the Union a proposal on April 16, 1968, to which the Union never responded.

The Special Master found that a final agreement had been reached and that Tate had the authority to bind the Company. Although Batchelder testified that he never gave Tate the authority to enter into a binding agreement without prior Company approval, the Master found that this was not borne out by other relevant evidence. The Company's counterproposal on October 18, 1967 contained the statement that "if the word of the Union representatives here is final then so is that of the Company negotiator." The Company contended, however, that it did not know that the word of the Union representative would be final and that the subsequent approval of International would not have to be sought. Additionally, Tate clearly indicated on several occasions, during negotiations that he had authority to bind the Company.

The Master further found that even if actual authority were found to be lacking, Tate had apparent authority since he indicated that he had authority and did not advise otherwise. See Teamsters, Chauffeurs, Warehousemen & Helpers Local Union 524 v. Billington, 402 F.2d 510 (9th Cir. 1968); United Steelworkers of America v. CCI Corp., 395 F.2d 529 (10th Cir. 1968), cert. denied, 393 U.S. 1019, 89 S.Ct. 627, 21 L.Ed.2d 564 (1969). After the Union negotiators signed the contract, Tate was under a duty to sign also upon the Company's prior representation that "if the word of the Union representatives is final then so is that of the Company negotiator."

■ While a collective bargaining contract need not be written to be enforceable, Warrior Constructors, Inc. v. International Union of Operating Engineers, Local Union 926 AFL–CIO, 383 F.2d 700 (5th Cir. 1967), refusal to execute an agreement incorporating the terms of a negotiated contract when requested is an unfair labor practice. See H. J. Heinz Co. v. NLRB, 311 U.S. 514, 526, 61 S.Ct. 320, 85 L.Ed. 309 (1941); NLRB v. Ogle Protection Serv., Inc., 375 F.2d 497, 500 (6th Cir. 1967), cert. denied, 389 U.S. 843, 88 S.Ct. 84, 19 L.Ed.2d 108 (1967); NLRB v. Ohio Car & Truck Leasing, Inc., 361 F.2d 404, 406 (6th Cir. 1966). Cf. NLRB v. Strong, 393 U.S. 357, 361, 89 S.Ct. 541, 21 L.Ed.2d 546 (1969).

Judge Van Pelt also found that the Company violated this court's order by granting pay raises to certain employees. Mr. Tate had advised Company officials that they were precluded from continuing their merit increases after the order to bargain but this was disregarded. The Union was not apprised of any of the raises prior to the time they were given nor was it given an opportunity to bargain over them. We agree with the

Special Master's recommendation that the Company should be held in contempt.

■ The question of the intent with which the claimed acts were done is not material unless the acts are equivocal and resort to the intent with which they are done is necessary to make their meaning clear. NLRB v. Whittier Mills Co., 123 F.2d 725, 727 (5th Cir. 1941). If the acts done are clearly in contravention of the court's decree, the intention is of no consequence. The absence of wilfulness does not relieve an individual from civil contempt since it is a sanction to enforce compliance with an order of the court and is not dependent on the state of mind of the respondent. McComb v. Jacksonville Paper Co., 336 U.S. 187, 191, 69 S.Ct. 497, 93 L.Ed. 599 (1948). The Board, nevertheless, has the burden of proving the alleged contempt and demonstrating it by clear and convincing evidence. W. B. Johnston Grain Co. v. NLRB, 411 F.2d 1215, 1217 (10th Cir. 1969); NLRB v. Alamo Express, Inc., 395 F.2d 481, 482 (5th Cir. 1968). We hold that it did so.

■ The requirement that the Company bargain collectively with the Union requires that it bargain over wages, hours and other terms and conditions of employment. Generally speaking, a unilateral change in wages without first contacting the Union and granting it an opportunity to negotiate amounts to a refusal to bargain and constitutes a violation of 29 U.S.C. § 158(a)(5). See NLRB v. Katz, 369 U.S. 736, 743, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962); NLRB v. Frontier Homes Corp., 371 F.2d 974, 979 (8th Cir. 1967). Furthermore, such conduct constitutes a violation of the duty to bargain collectively even absent a subjective showing of bad faith. NLRB v. Katz, *supra;* NLRB v. Newberry Equipment Co., 401 F.2d 604, 609 (8th Cir. 1968). An exception to this rule is where increases in wages are merely aimed at maintaining the status quo. Where there is a well-established company policy of granting certain increases at specific times, which is a part and parcel of the existing wage structure, the company is not required to inform the union and bargain concerning these increases. NLRB v. Southern Coach & Body Co., 336 F.2d 214, 217 (5th Cir. 1964). This is also true where raises are the result of a change in job or where there is a differential between skilled and unskilled employees and salaries are adjusted to maintain that differential. The latter category seems to be limited to situations where the customary differential is decreased or diminished by some external force such as by a rise in the minimum wage. However, discretionary increases in pay based upon management's assessment of the performance of an individual employee are not allowed. See NLRB v. Southern Coach & Body Co., *supra.*

The Special Master classified the types of pay raises granted here into three categories. The first category includes those employees whose raises the Company sought to justify on the basis that they were granted pursuant to the individuals' hiring agreements, which had been a long-time practice of the Company. However, there was no specific time interval between hiring and the guaranteed raise, it depending solely on the Company's determination of the employee's proficiency and attitude. The Special Master noted that these unilateral raises are exactly the type which were condemned in *Katz, supra,* and that the Company had a duty to inform the Union and give it an opportunity to bargain concerning them.

The second type of wage increase was that which the Company contended was necessary in order to maintain the proper differential between skilled and unskilled bindery workers after the federal minimum wage was increased. It appears that there was a Company policy to maintain a 40-cent differential between skilled and unskilled bindery workers, and that differential was substantially diminished by the increase in the federal

minimum wage, which was an external force wholly outside the Company's power to control. However, the raise was not sufficient to reestablish the prior differential and the Special Master found that while it was an attempt to maintain the status quo, it did not do so and therefore did not fall within the exception but was actually a change in wage over which the Company had a duty to bargain with the Union.

The third type of wage increase was allegedly granted because the workers moved to more complex equipment. The evidence showed, however, that there was no established rate for operators of this equipment and that the employees did not receive an increase at the time they changed jobs but only after they had become proficient in the operation of the machines. The Special Master therefore found that the reason for the increase in wages was based on the Company's unilateral evaluation of the employees' proficiency and not on the type job itself, and therefore the raises were the proper subjects for bargaining.

 The duty to notify the Union regarding proposed unilateral changes requires that notice be reasonably calculated to afford the Union an opportunity to bargain concerning the proposed changes. NLRB v. United Nuclear Corp., 381 F.2d 972, 976–977 (10th Cir. 1967). The Special Master found that there was never any specific notification or discussion regarding proposed unilateral pay raises, and that the Union did not find out about them until after they were granted and therefore the Company had failed to bargain collectively with the Union as required by this court's decree.

 Although the evidence is in conflict and the Company has made a persuasive argument here, the Master's findings of fact are binding upon this court unless clearly erroneous. 28 U.S.C., Fed.R.Civ.P. 53(e) (2); W. B. Johnston Grain Co. v. NLRB, *supra*, 411

F.2d at 1217; NLRB v. Alamo Express, Inc., *supra*, 395 F.2d at 482. The hearing was conducted by an able and distinguished district judge, and he has given meticulous consideration to all of the evidence. There is ample evidence to support the Master's conclusion, and we cannot therefore say that his findings are clearly erroneous.

It is ordered, adjudged and decreed that Ralph Printing & Lithographing Company is in civil contempt of this court and that said Company, through its officers and agents, shall purge itself of said contempt by:

1. Notifying Lithographers and Photoengravers International Union, AFL–CIO and its Local 203, Lithographers and Photoengravers International Union, AFL–CIO, (hereinafter collectively called the Union) within fifteen days from the entry hereof in writing that upon request of said Union it will execute the agreement concluded in April 1968 with Local 203.

2. If so requested by said Union, executing said agreement and delivering the executed copy to the Union within five days of the receipt of such request, and thereafter honoring it in good faith.

3. Otherwise fully complying with and obeying the said decree of the court including but not limited to refraining from offering, promising or granting to its employees wage increases or other benefits or instituting changes in terms and conditions of employment without first affording the Union notice and reasonable opportunity to bargain thereon.

4. Reimbursing its employees for all losses of wages and benefits as may have been lost by said employees by reason of the Company's unlawful refusal to execute the aforesaid agreement, together with interest at the rate of 6% per annum. If the parties cannot agree on the amounts of such losses, if any, the amounts shall be computed by the Board as in a backpay proceeding and submitted to the court for further review.

5. Commencing twenty days from the date hereof, posting in conspicuous places including all places where notices to employees are customarily posted for a period of sixty consecutive days, a notice, signed by the Company by an officer thereof, which states that the Company has been adjudicated in civil contempt for disobedience of the court's decree as set forth in this order, copy of this order to be posted with said notice, and that the Company has complied with the requirements of paragraphs 1 and 2 above, and that the Company will take the other action in purgation ordered by the court, and will maintain such notices and a copy of this order in clearly legible condition throughout such posting period, taking reasonable precautions that they are not defaced, altered or covered by any other material.

6. Filing a sworn statement with the Director of the Seventeenth Region of the Board notifying said Director in writing within twenty days after the entry of the order showing what steps have been taken by the Company to comply with the court's directions, and again at the end of the posting period showing that the Company has brought itself and maintains itself in compliance with the decree and this order.

7. Paying to the Board all court costs incurred in this appeal. The prayer of the Board for attorneys' fees and expenses of investigation is denied.

In order to insure compliance with the foregoing provisions, it is further ordered that upon the failure of respondent, its officers and agents to purge itself of contempt as herein provided, this court will deal further with the matter by imposing upon respondent a compliance fine of $500.00 and a further compliance fine of $100.00 per day for each day of continued noncompliance and by such other means as the court may direct, including the issuance of body attachment upon any officer or agent responsible for such noncompliance.

It is so ordered.