NATIONAL LABOR RELATIONS BOARD, Petitioner,

and

Hotel-Motel-Restaurant Employees & Bartenders Union, Local 86, Hotel, Restaurant & Bartenders International Union, AFL–CIO, Intervenor,

v.

SILVER SPUR CASINO, Respondent.

NATIONAL LABOR RELATIONS BOARD, Petitioner,

and

Hotel-Motel-Restaurant Employees & Bartenders Union, Local 86, Intervenor,

v.

NEVADA CLUB, INC., Respondent.

NATIONAL LABOR RELATIONS BOARD, Petitioner,

and

Hotel-Motel-Restaurant Employees & Bartenders Union, Local 86, Intervenor,

v.

SPARKS NUGGET, INC., d/b/a John Ascuaga's Nugget, Respondent.

NATIONAL LABOR RELATIONS BOARD, Petitioner,

and

Hotel-Motel-Restaurant Employees & Bartenders Union, Local 86, Intervenor,

v.

BARNEY'S CLUB, INC., Respondent.

NATIONAL LABOR RELATIONS
BOARD, Petitioner,

and

Hotel-Motel-Restaurant Employees &
Bartenders Union, Local 86,
Intervenor,

v.

FINALLY, INC., d/b/a The Palace
Club, Respondent.

Nos. 77–2311, 77–2939, 77–2954,
77–2658 and 77–2938.

United States Court of Appeals,
Ninth Circuit.

May 27, 1980.

As Amended on Denial of Rehearing and
Rehearing En Banc July 14, 1980.

Charles P. Donnelly, NLRB, Janet McCaa, Elliott Moore, Washington, D. C., for petitioner.

William W. Wertz, W. David Holsberry, Davis, Cowell & Bowe, San Francisco, Cal.,

**576**

for respondents; Severson, Werson, Berke & Melchior, J. Montobbio, San Francisco, Cal., on brief.

Before KENNEDY and ANDERSON, Circuit Judges, and SCHWARTZ,* District Judge.

J. BLAINE ANDERSON, Circuit Judge:

These consolidated cases are before this court pursuant to petitions filed by the National Labor Relations Board (Board) for enforcement of its Orders.[1] 29 U.S.C. § 160(e). The unifying issue is whether the employer-respondents violated sections 8(a)(1) and (5) of the National Labor Relations Act (the Act) by refusing to bargain with the Union. We shall consider this issue first, then deal with the other issues that pertain to the individual respondents.

## I. REFUSAL TO BARGAIN

### A. Background

The respondents were all members of the Reno Employers Council (Council), a voluntary association of employers engaged in casino, restaurant and related businesses. The Council existed in part for the purpose of representing member-employers, in mul-ti-employer units, in collective bargaining with labor organizations. The individual respondents joined the Council on different dates, but they all recognized the Union as the bargaining representative of a unit of their employees consisting of culinary workers, waiters and bartenders (employees). After being parties to successive multi-employer collective bargaining contracts with the Union,[2] respondents withdrew from their multi-employer bargaining units. Subsequent to their withdrawal from the multi-employer units, the respondents informed the Union that they would not negotiate new, individual collective bargaining agreements with the Union. Each respondent claimed to have a good faith doubt that the Union enjoyed the majority support of their respective employees.

Unfair labor practice charges were filed by the General Counsel of the Board against the respondents for their refusal to bargain with the Union. In each case the Board found that the respondents had committed unfair labor practices by withdrawing recognition of the Union as the collective bargaining representative of their employees and by refusing thereafter to bargain with the Union.[3] The Board ordered each respondent to cease and desist from the unfair labor practices and required each respondent to recognize and, upon request, bargain with the Union, and post certain

---

* The Honorable Edward J. Schwartz, Chief United States District Judge for the Southern District of California, sitting by designation.

1. We were advised by counsel for the respondents at oral argument that the Palace Club (No. 77–2938) had completely closed down, with no successor taking over that operation. The Board has not withdrawn its petition for enforcement of its order against the Palace Club. Without deciding whether the petition against the Palace Club has, in fact, been rendered moot, we deem this opinion to be moot as to the Palace Club if there is no employer upon whom the order may be enforced.

2. Sparks Nugget, Silver Spur, Nevada Club, and the Palace Club were in the same multi-employer bargaining unit and were signatories to the same 1972–1975 collective bargaining agreement with the Union as the Sierra Development Co., *NLRB v. Sierra Development Co.*, 604 F.2d 606 (9th Cir. 1979), and Carda Hotels,

*NLRB v. Carda Hotels*, 604 F.2d 605 (9th Cir. 1979).

Barney's Club, on the other hand, was a signatory to the same 1971–1974 collective bargaining agreement with the Union as Tahoe Nugget, *NLRB v. Tahoe Nugget*, 584 F.2d 293 (9th Cir.), cert. denied, 442 U.S. 921, 61 L.Ed.2d 290, 99 S.Ct. 2847, reh. denied, 444 U.S. 887, 100 S.Ct. 187, 62 L.Ed.2d 122 (1979), Nevada Lodge, *NLRB v. Nevada Lodge*, id., and Sahara-Tahoe, *Sahara-Tahoe Corp. v. NLRB*, 581 F.2d 767 (9th Cir.), cert. denied, 442 U.S. 917, 99 S.Ct. 2837, 61 L.Ed.2d 284, reh. denied, 444 U.S. 888, 100 S.Ct. 187, 62 L.Ed.2d 122.

3. *Silver Spur Casino*, 228 NLRB 1147 (1977); *Nevada Club, Inc.*, 229 NLRB 1186 (1977); *Sparks Nugget, Inc.*, 230 NLRB 275 (1977); *Barney's Club, Inc.*, 227 NLRB 414 (1977); *Finally, Inc. d/b/a Palace Club*, 229 NLRB 1128 (1977).

notices. These cases are before us in part, for the enforcement of those orders.

We enforce the Board's orders on the issue of the respondents' refusal to bargain based upon the principles we have announced in *Tahoe Nugget, Sahara-Tahoe, Carda Hotels,* and *Sierra Development.*[4]

We deal with the issue in more depth in the following discussion to emphasize and, where necessary, to clarify portions of our previous opinions.

### B. *Discussion*

■ In an unfair labor practice proceeding before the Board the burden is upon the General Counsel to establish by a preponderance of evidence that an unfair labor practice has occurred. *NLRB v. United Brotherhood of Carpenters & Joiners, etc.,* 531 F.2d 424, 426 (9th Cir. 1976). Where an employer has been charged with a violation of section 8(a)(5), refusal to bargain, the General Counsel must show that the union represented a majority of the employees in the unit at the time the employer refused to bargain with the Union. *NLRB v. Tahoe Nugget, Inc.,* 584 F.2d at 297.

### 1. *Presumption of Majority Support*

■ The General Counsel is assisted by a presumption of majority union support in its attempt to meet its burden of proving that the employer unlawfully refused to bargain. "For a reasonable time, usually one year, after certification or voluntary recognition, majority support is irrebuttably presumed absent 'unusual circumstances.' After one year, the presumption becomes rebuttable." *Id.* Where sufficient proof to rebut the presumption is not presented by the employer, the presumption carries the General Counsel's burden of proof regarding the unfair labor practice charge. *Id.*

■ An employer may rebut the presumption by presenting sufficient evidence to demonstrate that the union was actually in the minority or that the employer had a good faith reasonable doubt of the union's majority support at the time of the refusal to bargain. *Id.* If the presumption is deemed rebutted, then the General Counsel must come forward with evidence to satisfy its burden of proof. *National Cash Register Co. v. NLRB,* 494 F.2d 189 (8th Cir. 1974).

■ The rebuttable presumption was applied by the Board in these cases. The Board determined that the respondents had not rebutted the presumption and found that they had committed unfair labor practices by refusing to bargain with the Union.

The respondents challenge that determination on the grounds that:

a. the presumption should not be applicable in a situation where employers have withdrawn from a multi-employer unit;

b. an employer's good faith belief is all that is required to rebut the presumption of majority support for the union;

c. the objective factors considered by the respondents were sufficient to rebut the presumption of majority support for the union.

d. the respondents were improperly precluded from showing that only a minority of employees supported the union.

e. the Board has made it impossible to rebut the presumption under the circumstances.

### 2. *Withdrawal from the Multi-Employer Unit*

The respondents contend that their withdrawal from the multi-employer bargaining unit should allow them to start anew in their relationship with the Union. That is, they wish to be viewed as single employers faced with the Union's initial claim for recognition.

**4.** Citations at footnote 2.

In four previous cases[5] we have rejected that approach and have determined that the presumption survives an employer's withdrawal from the multi-employer bargaining unit.[6]

The bargaining history of the respondents shows that the same fact patterns have occurred. Thus, the conclusions reached in our previous cases apply equally as well here.

Moreover, our conclusion that the presumption survives the respondents' withdrawal from the multi-employer unit is a recognition that the presumption is also grounded in policy, not just probability. *NLRB v. Tahoe Nugget*, 584 F.2d at 302. The most valued objective of the Act is industrial peace. Application of the presumption is a policy determination by the Board that industrial peace is more likely to be achieved by maintaining continuity in the bargaining structure.

We have not failed to observe that, in so deciding, the Board has favored continuity in the bargaining structure over the enhancement of employee free choice. However, the Board's decision, while not enhancing employee rights, does not adversely affect those rights. As always, the employees may exercise their freedom of choice by petitioning the Board for an election to choose whether to have another representative or to have no union representation at all. Adherence to the presumption does not stifle that right.

The presumption does make it more difficult for the respondents to rely on employee rights in refusing to bargain with their employees' designated representative. However, as we stated in *Tahoe Nugget*, at 301, "[I]n refusing to bargain because of an alleged decline in union adherents, the employer is acting as vicarious champion of its employees, a role no one has asked it to assume." See, *Brooks v. NLRB*, 348 U.S. 96, 103, 75 S.Ct. 176, 99 L.Ed. 125 (1954).

We thus believe that the Board has not abused its discretion in applying the presumption of majority union support here where employers have withdrawn from a multi-employer unit.

### 3. *Good Faith Reasonable Doubt*

An employer may withdraw recognition from an incumbent union because of its asserted good faith doubt of the union's support. Respondents contend that under *Celanese Corporation of America*, 95 NLRB 664 (1951), the employer's good faith belief that the union no longer had the majority support of its employees is all that is required. The respondents misread *Celanese* and misconceive the law.[7]

---

**5.** *NLRB v. Tahoe Nugget*; *Sahara-Tahoe Corp. v. NLRB*; *NLRB v. Sierra Development Co.*; *NLRB v. Carda Hotels*.

**6.** In the formation of multi-employer units, it is an unfair labor practice for an individual employer to voluntarily recognize a union which does not enjoy majority support among that employer's employees. Thus when employers join a multi-employer unit and recognize the union, they are viewed as implicitly declaring that the majority of their employees favor the union. Subsequent withdrawal from the multi-employer unit simply entails a reversion to the original unit, a unit previously determined from the employer's own conduct to favor the union's representation. *NLRB v. Tahoe Nugget* at 303.

**7.** Respondents correctly quoted a passage from *Celanese* which states that:
"We believe that the answer to the question whether the Respondent violated Section 8(a)(5) of the Act on October 8 depends not on whether there was sufficient evidence to demonstrate that the Union in fact did not represent the majority of the employees but upon whether *the Employer in good faith believed* that the Union no longer represented the majority of the employees."
*Id.* at 671. However, the respondents failed to turn the page and read on as the Board, later in the opinion, went on to elaborate on the "good faith" criteria, and stated that:
"By its very nature, the issue of whether an employer has questioned a union's majority in good faith cannot be resolved by resort to any simple formula. It can only be answered in light of the totality of all the circumstances involved in a particular case. But among such circumstances, two factors would seem to be essential prerequisites to any finding that the employer raised the majority issue in good faith in cases in which a union had been certified. *There must, first of all, have been some reasonable grounds for believing that the union had lost its majority status* since its certification. And, secondly, the majority issue must not have been raised by the em-

An employer's good faith doubt of a union's majority status must be reasonable and supported by objective considerations. *NLRB v. Cornell of Cal., Inc.*, 577 F.2d 513, 515–516 (9th Cir. 1978); *Dalewood Rehabilitation Hospital, Inc. v. NLRB*, 566 F.2d 77, 80 (9th Cir. 1977); *NLRB v. Tahoe Nugget*, 584 F.2d at 299. Respondents' contrary interpretation of the law is erroneous.

#### 4. Establishing Good Faith Reasonable Doubt

██ Whether an employer has established a good faith reasonable doubt defense is a determination that must be made initially by the Board. The Board's decision will be upheld if it is supported by substantial evidence on the record as a whole. *Sahara-Tahoe Corp. v. NLRB*, 581 F.2d at 771.

In *Tahoe Nugget* and *Sahara-Tahoe* we stressed that the evidence presented to establish reasonable good faith doubt, individually or cumulatively, must unequivocally indicate that union support had declined to a minority. In those cases the Board found that the employers had not established the good faith doubt defense. Some evidence was presented of employee discontent, high employee turnover rates, low union membership, financial difficulties of the union, and a vigorous union membership drive. However, after evaluating the evidence, the Board determined that the evidence introduced by the respondents was not sufficient to support a good faith reasonable doubt of the union's majority status. The evidence, standing alone or viewed in their totality, presented only an ambiguous inference of loss of majority support for the union. We enforced the Board's orders in those cases, determining that there was substantial evidence on the record as a whole to support the findings.

██ The evidence presented here does not differ materially from that considered by the Board and this court in *Tahoe Nugget* and *Sahara-Tahoe*. The Board in the

present cases found that the respondents failed to establish the good faith reasonable doubt defense. Substantial evidence on the record as a whole supports the findings that the evidence, individually or cumulatively, presents only an equivocal inference of loss of majority support for the union.

#### 5. Actual Loss of Majority

██ The presumption may also be rebutted when the employer brings forth sufficient evidence to demonstrate that the union did not, in fact, have the support of a majority of the employees in the unit. *Tahoe Nugget*, 584 F.2d at 297.

██ In *Barney's Club* the administrative law judge determined that the respondent's evidence fell short of demonstrating that the union did not have majority support. The Board affirmed. Reviewing the record as a whole, we uphold that decision.

In *Silver Spur, Sparks Nugget, Nevada Club* and *Finally, Inc.*, the respondents were restricted in their ability to question Board field examiner David Sargent and Union agent Howard Lawrence. They contend that the Board's actions erroneously prevented them from presenting their "actual loss of majority" defense and thus their cases should be remanded.

#### a. Board Field Examiner Sargent

Respondents, in their individual cases, subpoenaed Board field examiner Sargent. The administrative law judges quashed the subpoenas on the basis that Sargent's testimony would have been irrelevant (*Nevada Club; Finally, Inc.*), or that 29 CFR § 102.-118 prevented the subpoena from issuing to an agent of the Board without the Board's or General Counsel's consent (*Silver Spur; Sparks Nugget*).

In *NLRB v. Heath Tec Division/San Francisco*, 566 F.2d 1367, 1371 (9th Cir.) *cert. denied*, 439 U.S. 832, 99 S.Ct. 110, 58 L.Ed.2d 127 (1978), we stated that in the

---

ployer in a context of illegal anti-union activities, or other conduct by the employer aimed at causing disaffection from the union or indicating that in raising the majority issue

the employer was merely seeking to gain time in which to undermine the union." (emphasis added)
*Id.* at 673.

absence of some valid evidentiary objection or privilege, 29 CFR § 102.118 cannot alone be the basis for the revocation of a properly issued subpoena. Thus the rulings of the administrative law judges in *Silver Spur* and *Sparks Nugget* were erroneous. However, the Board upheld the quashing of the subpoenas in all the cases, finding that a valid evidentiary privilege and a valid evidentiary objection existed. We agree.

The Board determined that there was an evidentiary privilege which protected the informal investigatory and trial preparatory process of administrative agencies, citing *Stephens Produce Co., Inc. v. NLRB*, 515 F.2d 1373, 1376–1378 (8th Cir. 1975). Sargent apparently had spoken informally to the attorneys representing the respondents and had stated that the refusal to bargain charges would probably be dismissed. Later, however, formal complaints were filed, charging the respondents with refusing to bargain. Through Sargent respondents sought to establish that the initial determinations were actually made and they also sought the information which provided the basis for those determinations.

█ It is clear that the testimony and documents which the respondents sought were informal investigatory material and preliminary determinations. The qualified privilege of preserving the confidentiality of investigative files is applicable here. *NLRB v. Heath Tec*, 566 F.2d at 1370; *Stephens Produce Co., Inc. v. NLRB*, 515 F.2d at 1376.

As in *Heath Tec*, and *Stephens Produce Co., supra*, we conclude that the investigatory privilege concerning "informal deliberations of all prosecutorial agencies and branches of the government" (*Stephens Produce*, p. 1376, n.1) was properly invoked. Others were present during conversations with Sargent. They were not called as witnesses, however, and respondents have shown no reason why examining these people was not possible or would not have produced information similar to that which they sought from Sargent. Moreover, we have some doubt whether the information sought was sufficiently material to respondents' case to outweigh the privilege.

b. *Union Agent Lawrence*

The Board also sustained objections to the questioning of Union agent Lawrence regarding whether the Union had any records that would disclose it represented an actual majority of the unit employees of the respective respondents. The Board determined that the line of questioning was irrelevant because where union membership was voluntary, as in Nevada, such records provided no correlation to whether a majority of employees desired representation.

█ We affirm the Board's decision, but on a different basis. The Board cited *Retired Persons Pharmacy v. NLRB*, 519 F.2d 486, 491 (2d Cir. 1975), for the proposition that union membership is irrelevant to the determination of a union's majority status. We do not agree. It is true that in a right-to-work state an employee may choose not to join a union, but, nevertheless, desire union representation. However, this observation does not render union membership irrelevant to a determination of whether an employee had a reasonable doubt of the union's majority or whether the union in fact lacked majority support. Union membership, even in a right-to-work state, is some indication of union support, though it may be only marginally relevant. *NLRB v. Tahoe Nugget*, 584 F.2d at 307, *NLRB v. Vegas Vic, Inc.*, 546 F.2d 828 (9th Cir.), *cert. denied*, 434 U.S. 818, 98 S.Ct. 57, 54 L.Ed.2d 74 (1978), and *Terrell Machine Co. v. NLRB*, 427 F.2d 1088, 1090 (4th Cir.), *cert. denied*, 398 U.S. 929, 90 S.Ct. 1821, 26 L.Ed.2d 91 (1970), are not to the contrary.

█ The question asked by the respondents was whether the Union could produce any records that would demonstrate that it had the majority support of the employees. Although not dispositive, the question had some relevance to the issues of the Union's majority status and should have been allowed.

However, based upon the record before us, we cannot say that reversible error was committed. If the Union had answered the question affirmatively, the Union's position

would have been bolstered. If the question had been answered in the negative, that would have presented only slight evidence that the Union in fact did not have the majority support of the employees. Even with the addition of this evidence, the presumption would not have been rebutted.[8] Therefore, we find no error that would require a reversal.

### 6. Impossibility of Rebutting the Presumption

Finally, the respondents contend that the Board has in effect created a presumption that is impossible to rebut. Respondents argue that the burden is placed upon them to rebut the presumption, but they are denied the means to do so. Further, the respondents contend that the Board has demanded more evidence than should be required to rebut the presumption.

We find no merit to the respondents' first argument. As we discussed in the previous section, the Board's rulings regarding Board field examiner Sargent and union agent Lawrence did not improperly deny the respondents access to information.

As to the respondents' second argument, we recognize the force of their contention that the Board has accorded too much weight to the presumption in these cases. This issue involves an important and difficult question which is of current national interest in the labor relations field. Respondents cite cases in other circuits which

may have found the presumption rebutted upon similar or even weaker evidence than was presented in these cases.[9] Accepting, arguendo, that a conflict exists on this issue, we nevertheless adhere to the views expressed in this and our previous opinions. While we find that there is substantial evidence on the record as a whole to support the Board's decision in each of these cases, we also believe that the policies and goals of the Act will be best served by the enforcement of the Board's orders on the respondents' refusal to bargain.

## II. NO SOLICITATION RULE

### A. Background

In *Barney's Club* and *Sparks Nugget* the employers promulgated no-solicitation rules which, among other things, prohibited employees from soliciting on company premises after their shifts had been completed. The Board determined in both cases that the employers had violated Section 8(a)(1) of the Act, 29 U.S.C. § 158(a)(1), by maintaining the rules. We agree with the Board that the rules promulgated by these respondents were violative of Section 8(a)(1). However, we believe the Board's orders were too broad. We thus enforce the Board's order as modified herein.

### B. Discussion

#### 1. Applicable Law

The freedom to communicate is essential to the effective exercise of organi-

---

8. See, *Barney's Club Incorp.*, 227 NLRB 414 (1976) (Board affirming administrative law judge's determination that the respondent failed to establish that the Union in fact did not represent a majority of the respondent's employees).

Moreover, respondents did not materially rephrase the question after the administrative law judge's ruling and either ended the line of questioning or dropped the subject matter.

9. Respondents have cited cases from various circuits where the presumption of majority support was deemed rebutted. See, *e. g.*, *Ingress-Plastene, Inc. v. NLRB*, 430 F.2d 542 (7th Cir. 1970); *Star Manufacturing Co. v. NLRB*, 536 F.2d 1192 (7th Cir. 1976); *Lodges 1746 & 743, Int'l Ass'n of Mach. & Aero. Workers v. NLRB*, 416 F.2d 809 (D.C.Cir.), *cert. denied*, 396 U.S. 1058, 90 S.Ct. 751, 24 L.Ed.2d 752 (1970); but see, *Teamsters Local U. 769 v. NLRB*, 532

F.2d 1385 (D.C.Cir.1976); *National Cash Register Co. v. NLRB*, 494 F.2d 189 (8th Cir. 1974); *National Car Rental System v. NLRB*, 594 F.2d 1203 (8th Cir. 1979); *NLRB v. Alvin J. Bart & Co., Inc.*, 598 F.2d 1267 (2d Cir. 1979); *W & W Steel Co. v. NLRB*, 599 F.2d 934 (10th Cir. 1979); *Automated Business Systems v. NLRB*, 497 F.2d 262 (6th Cir. 1974); *NLRB v. Nu Southern Dyeing & Finishing, Inc.*, 444 F.2d 11 (4th Cir. 1971); *NLRB v. Randall-Eastern Ambulance Service, Inc.*, 584 F.2d 720 (5th Cir. 1978). Of these cases cited by respondents, we believe only *W & W Steel Co. v. NLRB, Star Manufacturing Co. v. NLRB*, and *Ingress-Plastene, Inc. v. NLRB*, present factual situations in which other circuits may have found the presumption of majority support rebutted upon similar or weaker evidence than presented in these cases.

zational rights granted to employees under Section 7 of the Act, 29 U.S.C. § 157. *Central Hardware Co. v. NLRB*, 407 U.S. 539, 543, 92 S.Ct. 2238, 2241, 33 L.Ed.2d 122 (1972); *Beth Israel Hospital v. NLRB*, 437 U.S. 483, 491, 98 S.Ct. 2463, 2469, 57 L.Ed.2d 370 (1978). However, the right of employees to solicit or distribute materials must be balanced against an employer's right to maintain discipline in its establishment. *Republic Aviation Corp. v. NLRB*, 324 U.S. 793, 797–798, 65 S.Ct. 982, 985, 89 L.Ed. 1372 (1945). Thus, certain rules have been developed with respect to the exercise of employee organizational rights under Section 7. Since "working time is for work," a rule prohibiting employee solicitation and distribution of literature during work time is presumed to be valid. On the other hand, "the time outside [work], whether before or after work, or during luncheon or rest periods, is an employee's time to use as he wishes without unreasonable restraint," even though he is on company property. Therefore, a rule prohibiting employee solicitation or distribution of literature during nonworking time in nonwork areas is presumptively invalid unless special circumstances warrant the adoption of the rule. *Republic Aviation*, at 802 n. 10; *NLRB v. Magnavox Co.*, 415 U.S. 322, 325, 94 S.Ct. 1099, 1102, 39 L.Ed.2d 358, *reh. denied*, 416 U.S. 952, 94 S.Ct. 1962, 40 L.Ed.2d 302 (1974).

The finding of the requisite "special circumstances" or an exception to the presumption of invalidity may arise where the business is one dealing in direct selling and service to customers. The Board has approved employer rules which prohibit all employee solicitations, even during an employee's nonworking time, in the selling areas of stores and restaurants on the theory that such activity may tend to drive away customers. *May Department Stores Co., d/b/a Famous-Barr Co.*, 59 N.L.R.B. 976, 981, *enf'd as modified*, 154 F.2d 533 (8th Cir.), *cert. denied*, 329 U.S. 725, 67 S.Ct. 72, 91 L.Ed. 627 (1946); *Goldblatt Bros., Inc.*, 77 N.L.R.B. 1262, 1264 (1948); *Marriott Corp., (Children's Inn )*, 223 N.L.R.B. 978 (1978); *see also Beth Israel Hospital*, 437

U.S. at 493, 98 S.Ct. at 2470. In allowing the broader no-solicitation rules, the goal has been to strike the appropriate balance between organizational rights of employees and the rights of employers to control their businesses. Thus, as the Supreme Court stated in *Beth Israel Hospital*, 437 U.S. at 506, 98 S.Ct. at 2476:

> "In the retail marketing and restaurant industries, the primary purpose of the operation is to serve customers, and this is done on the selling floor of a store or in the dining area of a restaurant. Employee solicitation in these areas, if disruptive, necessarily would directly and substantially interfere with the employer's business. On the other hand, it would be an unusual store or restaurant which did not have stockrooms, kitchens, and other nonpublic areas, and in those areas employee solicitation of nonworking employees must be permitted. In that context, the Board concluded that, on balance, employees' organizational interests do not outweigh the employer's interests in prohibiting solicitation on the selling floor."

However, the fact that an establishment is a restaurant or a store does not automatically allow it to impose a broad no-solicitation rule. In *Beth Israel Hospital* the question was whether a hospital cafeteria could prohibit employee solicitations in its dining room. The Supreme Court noted that the primary purpose of the hospital was patient care and therapy. The hospital cafeteria functioned more as an employee-service area than a patient care area, as 77% of its patrons were employees. Thus the Court stated that "when the primary function and use of the cafeteria, the availability of alternative areas of the [hospital] facility in which § 7 rights effectively could be exercised, and the remoteness of interference with patient care are considered," it was appropriate for the Board to strike the balance in favor of § 7 rights in the hospital cafeteria. *Id.* at 437 U.S. at 506, 98 S.Ct. at 2476. Therefore, the relationship of the restaurant or store to the employer's business enterprise must also be considered in striking the appropriate balance between employee and employer rights.

■ Even though an employer's business enterprise justifies a more restrictive no-solicitation rule, that rule may be over-broad and thus invalid. *Marriott Corp.* at 978. In *Marriott Corp.* the Board stated that the employer could prohibit solicitation, even during employee break and lunch periods, in areas where customers were likely to be present. However, the Board determined that the employer's rule was not limited to the customer or sales area of the restaurant; thus the rule was declared to be over-broad and invalid on its face.

### 2. Present Cases

■ In *Barney's Club* and *Sparks Nugget* the respondent employers are engaged primarily in the direct service of customers through their gambling, restaurant and bar facilities. There is no contention that any of these facilities serve primarily as employee-service areas. Thus, under the previously-discussed precedents, the respondents could promulgate no-solicitation rules which prohibited employees from engaging in solicitation or distribution of materials in areas open to the public even during non-working periods.

■ We agree with the Board, though, that the rules promulgated by the respondents were overly broad and thus invalid. However, the Board's orders in these cases were themselves overly broad. The orders stated that the respondents must cease and desist from:

> "maintaining any rule or regulation prohibiting its employees from soliciting on its premises after their shifts have been completed unless such prohibition is demonstrably necessary to maintain production, discipline or security."

The orders go too far. Since the respondents could prohibit their employees from soliciting during nonworking hours in public areas of their premises, we modify the Board's order to read that the respondents must cease and desist from:

> "maintaining any rule or regulation prohibiting its employees from soliciting on its premises during nonworking hours in nonpublic areas of its premises, unless

such prohibition is demonstrably necessary to maintain production, discipline or security."

We enforce the Board's order on this issue as modified.

### III. UNILATERAL CHANGES

■ As long as its bargaining obligation is not extinguished, an employer has a continuing duty to bargain over mandatory subjects of bargaining without instituting unilateral changes, even after the expiration of the prior agreement. *NLRB v. Sky Wolf Sales*, 470 F.2d 827 (9th Cir. 1972). See, *Allied Chemical & Alkali Workers v. Pittsburg Plate Glass Co.*, 404 U.S. 157, 92 S.Ct. 383, 30 L.Ed.2d 341 (1971). Mandatory subjects of collective bargaining include insurance benefits and grievance procedures for employees. 404 U.S. at 159, 92 S.Ct. at 387; The Developing Labor Law, 404 (1971).

In *Sparks Nugget*, the Board found that the employer committed unfair labor practices in violation of Sections 8(a)(5) and (1) of the Act, 29 U.S.C. §§ 158(a)(5) and (1), by unilaterally implementing a new grievance procedure and a new insurance program.

■ The respondent's sole argument to justify the unilateral change in the grievance procedure was that the change was made after its obligation to bargain had terminated. We have already ruled in Section I that there was a continuing duty to bargain. The respondent's unilateral change of the grievance procedures was an unfair labor practice. *NLRB v. United Nuclear Corp.*, 381 F.2d 972 (10th Cir. 1967). We enforce the Board's order on this issue.

There appears to be little question that the new insurance plan was implemented by the respondent without consultation or negotiation with the Union over the matter. The respondent was found to have committed an unfair labor practice. The administrative law judge, however, limited the proposed remedy to requiring the respondent to "cease and desist from unilaterally altering or modifying the terms and conditions of a collective bargaining agreement it may

have with the Union" (R. 151) because he found that the Union had condoned the respondent's actions.[10] The decision and order were affirmed by the Board. We cannot agree that an unfair labor practice can be found as the acts were condoned.

Condonation takes place when the injured party demonstrates a willingness to forgive the improper conduct and "wipe the slate clean." *Confectionery & Tobacco Drivers & Warehousemen's Union v. NLRB*, 312 F.2d 108, 113 (2d Cir. 1963); *Cast Optics Corp. v. NLRB*, 458 F.2d 398, 404 (3d Cir.) *cert. denied*, 409 U.S. 850, 93 S.Ct. 58, 34 L.Ed.2d 92 (1972). In *Confectionery & Tobacco Drivers*, employees had engaged in a walkout in violation of their contractual no-strike clause. The court there stated, however, that, "[A]fter a condonation the employer may not rely upon prior unprotected activities of employees to deny reinstatement to, or otherwise to discriminate against, them." 312 F.2d at 113.

We agree with the Board that condonation took place with regard to the implementation of the new insurance plan. The Union's condonation of the unilateral action, however, "wipes the slate clean." The Board erred in its application of the law on condonation; there was no unfair labor practice upon which to base the charge. We, therefore, deny enforcement of the cease and desist order.

## IV. REFUSING TO PROVIDE A COPY OF THE NEW INSURANCE PLAN

There is a duty on the part of the employer to supply the Union, upon request, with sufficient information to enable the Union to effectively carry out its collective bargaining duties. *San Diego Newspaper Guild, etc. v. NLRB*, 548 F.2d 863, 866 (9th Cir. 1977). The information, however, must be relevant to a legitimate union collective bargaining need. *Id.*, 548 F.2d at 867. Failure of the employer to comply with a request for relevant information is a violation of Sections 8(a)(5) and (1) of the Act, 29 U.S.C. §§ 158(a)(5) and (1).

The administrative law judge found, and the Board summarily affirmed, that the respondent committed an unfair labor practice in violation of Sections 8(a)(5) and (1) by its refusal to furnish the Union with a requested copy of the new insurance program. Since there was a continuing duty to bargain, the refusal to comply with the request was found to inhibit the Union in meaningfully bargaining with the respondent. We enforce the Board's order on this issue; substantial evidence on the record as a whole supports the Board's determination.

## V. INTERROGATION OF EMPLOYEE LAUNIUS

Section 8(a)(1) of the Act, 29 U.S.C. § 158(a)(1), provides that it shall be an unfair labor practice for an employer to interfere with, restrain or coerce employees in the exercise of their rights guaranteed under Section 7 of the Act. The questioning of employees by the employer regarding their concerted activities can be a violation of Section 8(a)(1) where it interferes with Section 7 rights. *Amalgamated Meat Cutters, etc., Local No. 364 v. NLRB*, 435 F.2d 668 (9th Cir. 1970). However, employer questioning of employees regarding their concerted activities is not per se unlawful. *Penasquitos Village, Inc. v. NLRB*, 565 F.2d 1074, 1080 (9th Cir. 1977). "The test is whether, under all the circumstances, the interrogation reasonably tends to restrain or interfere with employees in the exercise of their protected rights." *Id.* at 1080. To be an unfair labor practice, interrogation "must be associated with express or implied threats or promises, or form part of an

---

**10.** The administrative law judge stated:

"It further appears from the failure of the Union to lodge any protest with regard to the unilateral implementation of the program, the position taken by the Union as to compliance with Section 3 of article XVIII, and the attempt, disclosed in McKinlay's testimony,

to obtain benefits for an employee under the program, that the Union condoned the Respondent's failure to consult with it prior to its implementation . . . ." (R. 151) The Board affirmed the administrative law judge's findings.

overall pattern tending to restrain or coerce employees with regard to their protected activities." *Amalgamated Meat Cutters,* 435 F.2d at 669.

The Board affirmed the administrative law judge's finding that the employer in *Sparks Nugget* unlawfully interrogated employee Gail Launius in violation of Section 8(a)(1). The administrative law judge's determination was based upon its finding that the totality of the circumstances indicated animosity towards the employee for her union activity and that a threat of discharge for any "further" violation of the company's no solicitation rule was made.

This issue presents a close question. However, the inferences drawn from the facts by the administrative law judge and affirmed by the Board are reasonable. Finding substantial evidence on the record as a whole, we enforce the Board's order on this issue.

## VI. *REPRIMAND OF EMPLOYEE DYER*

An employer violates Sections 8(a)(3) and (1) of the Act, 29 U.S.C. §§ 158(a)(3) and (1) by discriminating to encourage or discourage membership in any labor organization. *Radio Officers' Union v. NLRB,* 347 U.S. 17, 74 S.Ct. 323, 98 L.Ed. 455 (1954). Discrimination violative of Sections 8(a)(3) and (1) may be found where an employer disciplines an employee because that employee has engaged in or is suspected of engaging in union activities. *NLRB v. Bin-Dictator Co.,* 356 F.2d 210, 214–215 (6th Cir. 1966).

The Board found that employee John Dyer was reprimanded by the employer in *Sparks Nugget* because he was suspected of engaging in union activities and the employer sought to deter him from such activities. (R. 146) While different inferences may be drawn from the facts, the inferences drawn by the Board were reasonable and supported by substantial evidence on the record as a whole. We enforce the Board's order on this issue.

## *CONCLUSION*

Summarizing our disposition of the various issues considered:

1. We enforce the Board's orders with regard to the respondents' refusal to bargain (Section I);

2. The Board's orders concerning the respondents' no solicitation rules in *Barney's Club* and *Sparks Nugget* are enforced as modified (Section II);

3. The Board's order regarding the unilateral changes made in *Sparks Nugget* is enforced as to the unilateral implementation of the new grievance procedure, but denied as to the unilateral implementation of the insurance program (Section III);

4. The respondent in *Sparks Nugget* committed an unfair labor practice in refusing to provide the Union with a copy of the new insurance program; therefore, we enforce the Board's order on that issue (Section IV);

5. The interrogation of Sparks Nugget employee Launius and the reprimand of employee Dyer were unfair labor practices. Thus, we enforce the Board's order on those issues (Sections V & VI).

IT IS SO ORDERED.