**FINANCIAL INSTITUTION EMPLOYEES OF AMERICA, LOCAL NO. 1182, CHARTERED BY UNITED FOOD AND COMMERCIAL WORKERS INTERNATIONAL UNION, AFL–CIO, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent,**

and

**Seattle-First National Bank, Intervenor.**

No. 82–7736.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Sept. 7, 1983.

Decided Aug. 2, 1984.

Rehearing and Rehearing En Banc
Denied Dec. 26, 1984.

Laurence Gold, Washington, D.C., for petitioner.

Allison W. Brown, Jr., N.L.R.B., Washington, D.C., Mark A. Hutcheson, Davis, Wright, Todd, Riese & Jones, Seattle, Wash., for respondent.

Before WRIGHT, PREGERSON, and FERGUSON, Circuit Judges.

PREGERSON, Circuit Judge:

The National Labor Relations Board now requires that non-union employees participate in a certified union's internal decision to affiliate with another labor organization before the Board will amend the newly-affiliated union's certification as the unit's exclusive bargaining representative. The question before us is whether the new rule is rational and consistent with the National Labor Relations Act (NLRA). Because the rule fails this test, we grant the union's petition for review and reject the rule.

## PROCEDURAL BACKGROUND

### A. *Affiliation Decisions and the Board's New Rule*

In this case, an independent, Board-certified union of bank employees, Firstbank Independent Employees Association, voted to affiliate with the Retail Clerks Union

(Retail Clerks). In accordance with the independent union's constitution, only union members voted in the affiliation election. Upon a vote favoring affiliation, the union changed its name to Financial Institution Employees of America, Local 1182, chartered by the Retail Clerk's International Union, AFL–CIO.[1] The Board determined that the affiliation did not substantially change the character of the union. *Seattle-First National Bank,* 241 N.L.R.B. 751 (1979). The Board then amended the independent union's certification as the exclusive bargaining representative of the bank's employees to designate the newly-affiliated union as the independent's successor. *Id.* When the employer, Seattle-First National Bank, refused to bargain with the newly-affiliated union, the Board found the Bank guilty of an unfair labor practice and ordered it to bargain. *Financial Institution Employees of America,* 245 N.L.R.B. 700 (1979).

In reaching its decision to amend the union's certification, the Board followed its established practice of conducting "due process" and "continuity" determinations.[2] A "continuity" finding between a pre- and post-affiliation union has traditionally been the prerequisite for the Board's amendment of a union's certification. In this case, the Board found continuity between the pre- and post-affiliation union. 241 N.L.R.B. at 752. In amending the union's certification and ordering the Bank to bargain, the Board specifically relied upon a contemporaneous case, *Amoco Production Co. (Amoco III),* 239 N.L.R.B. 1195 (1979), in which the Board found continuity despite the fact that non-union members had not been allowed to vote on the affiliation question. In *Amoco III,* the Board stressed that affiliation elections are internal union matters; thus, the Board did not require

non-union employees to participate in those elections. Amoco Production Company appealed *Amoco III* to the Fifth Circuit; Seattle-First National Bank appealed the instant case to this circuit.

The Fifth Circuit remanded *Amoco III* to the Board for a statement of facts supporting the Board's affirmative continuity determination. *Amoco Production Co. v. NLRB,* 613 F.2d 107, 112 (5th Cir.1980). The Board's opinion had failed to set out those facts and the court could not determine whether the Board's continuity finding was supported by substantial evidence. *Id.* After the Fifth Circuit's remand, the Board asked us to remand as well because our case was analytically linked to *Amoco III.* We complied. *Seattle-First National Bank v. NLRB,* Nos. 80–7004 & 79–7515 (9th Cir. June 27, 1980) (order granting Board's motion for remand).

On remand from the Fifth Circuit, the Board, by a 3–2 vote, overruled *Amoco III* and concluded, in *Amoco Production Co. (Amoco IV),* 262 N.L.R.B. 1240 (1982), that affiliation decisions were *not* internal union matters. The Board held that a unit-wide vote on affiliation was a necessary prerequisite to obtaining an amended certificate showing the new affiliate as the successor bargaining representative. The Board declared that "due process" required a unit-wide vote and because a unit-wide vote had not been taken, the Board did not reach the continuity issue. The Board then revoked its earlier amendment of the union's certification and dismissed the unfair labor practice complaint against the employer, which had been based on the employer's repudiation of the existing contract and refusal to bargain. The union appealed the Board's *Amoco IV* decision to the Fifth Circuit.

---

**1.** After the Board amended the union's certification, the Retail Clerks merged with the Amalgamated Meat Cutters and Butcher Workmen of North America to become the United Food and Commercial Workers International Union, AFL–CIO. The Board accepted this change.

**2.** "Due process" in the context of the Board's review of affiliation decisions is discussed *infra*

pp. 360, 366–367 & note 6. "Continuity" means that the union, even though newly affiliated with another labor organization, is essentially the same union that the Board originally certified to represent the bargaining unit. *See infra* pp. 1487–1488 (describing the continuity determination process).

Similarly, the Board, by a 3–2 vote, changed its earlier opinion in our case and followed *Amoco IV.* The Board's opinion states that excluding nonmembers from voting in affiliation decisions violates "fundamental due-process standards." *Seattle-First National Bank,* 265 N.L.R.B. No. 55, 265 NLRB 426, 426 (1982). The Board revoked the newly-affiliated union's amended certification and dismissed the previously-granted refusal to bargain/unfair labor practice charge against the bank. The Board did not reconsider whether continuity existed between the pre- and post-affiliation union. The union petitioned for review.

In the *Amoco IV* appeal, the Fifth Circuit affirmed the Board's new ruling after acknowledging the existence of "strong arguments to the contrary." *Local Union No. 4–14 v. NLRB,* 721 F.2d 150, 152–53 (5th Cir.1983). In a brief opinion, the court deferred to the Board, explaining, "[W]e are unable to say that the general ruling that now requires the participation of non-union members in an affiliation election is irrational or inconsistent with the Act . . . ." *Id.*

B. *Effect of the Board's New Rule*

■ Unless a union puts an affiliation decision to a vote of all employees in the bargaining unit, the Board will not consider whether sufficient continuity exists be-tween a pre- and post-affiliation union to justify amending the union's certification. Generally, the Board will not enforce an employer's duty to bargain in good faith under § 8(a)(5) of the National Labor Relations Act, 29 U.S.C. § 158(a)(5) (1982), unless the newly-affiliated union has had its certificate amended. This means that under the Board's new rule an employer may, with impunity, refuse to bargain with any union that affiliates without permitting non-union employees to participate in what until recently was considered an internal union affair. In effect, the Board now requires that *all* union affiliation decisions be put to a vote of all employees, union and non-union, in the bargaining unit.[3]

The Board changed the rule because it now believes that affiliation is not an internal union matter. Instead, the Board suggests that affiliation by its very nature implicates the guaranteed rights of all employees to choose a bargaining representative selected by the majority. Under the Board's new approach, an affiliation decision will always call a union's continuing majority status into question.

STANDARD OF REVIEW

■ The Board's decision in this case announces an altered interpretation of the National Labor Relations Act.[4] In reviewing such decisions, we accord the Board's

---

**3.** See, for example, *Amoco IV,* in which the Board refused to amend the union's certification because non-union employees were not allowed to vote in an affiliation decision. There, even if all non-union employees had voted, and all of them had voted against affiliation, the unit as a whole would have approved the affiliation.

**4.** The Bank and the amicus U.S. Chamber of Commerce discuss extensively the factual merits of the union's actual continuity. If we grant the union's petition, the Bank suggests that we should deny the union amended certification because of the substantial lack of continuity between the pre- and post-affiliation union. The Chamber of Commerce, on the other hand, suggests that we should consider the factual merits first, and therefore need not review the rule because the post-affiliation union allegedly differs substantially from the pre-affiliation union. We are unable to comply with either request. When the Board, in the wake of the Fifth Circuit's remand of *Amoco III,* asked us to

remand the case in which the Board considered the continuity factors, we complied. Thus, we are without power to consider the factual continuity question because such determinations are the province of the Board, subject only to our review to ensure that those decisions are based on "substantial evidence." *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951); *Retail Store Employees Local 428 v. NLRB,* 528 F.2d 1225, 1227 (9th Cir.1975).

The union also asks us to consider the factual merits and then to reinstate the Board's prior continuity finding, the earlier amended certification, and the unfair labor practice finding against the Bank. As we have just explained, the case in which the continuity decision favorable to the union was made is no longer before us. The case before us involves only the Board's new rule. *See also infra* note 16.

interpretation substantial deference and review the decision for "rationality and consistency with the Act." *NLRB v. Nevis Industries, Inc.,* 647 F.2d 905, 909 (9th Cir.1981); *see Ford Motor Co. v. NLRB,* 441 U.S. 488, 494, 497, 99 S.Ct. 1842, 1847, 1849, 60 L.Ed.2d 420 (1979); *Machinists Local 1327 v. NLRB,* 725 F.2d 1212, 1215 (9th Cir.1984). Therefore, we will uphold the new rule if it is rational and consistent with the NLRA, and we will reject the rule if it is not.

## DISCUSSION

### A. Background: Certification, Affiliation, and Continuity Decisions

Section 7 of the NLRA guarantees employees the right "to bargain collectively through representatives of their own choosing." 29 U.S.C. § 157 (1982). Section 9(a) of the NLRA mandates that "[r]epresentatives designated or selected for the purposes of collective bargaining by the majority of the employees ... shall be the exclusive representatives" of the unit's employees. 29 U.S.C. § 159(a) (1982). Once the Board is satisfied that a union is the chosen representative of a unit's employees in accordance with § 7,[5] the Board will certify the union as the unit's exclusive bargaining representative under § 9(a). A union seeks certification as the exclusive bargaining representative for many reasons, not the least of which is to gain the NLRA's protection if the employer commits an unfair labor practice. *See, e.g.,* 1 C. Morris, *The Developing Labor Law* 341 (2d ed. 1983).

Under certain circumstances, a certified bargaining representative may lose substantial support within the union or the unit as a whole. When this happens, the employees, whether union or non-union, may ordinarily petition the Board to decertify the union. 29 C.F.R. § 101.17 (1983). If, after investigating the petition, the Board determines that "a question of representation" exists, the Board must hold a

hearing to decide whether the union should continue to represent the unit. NLRA § 9(c)(1)(A)(ii), 29 U.S.C. § 159(c)(1)(A)(ii) (1982). At least 30% of the unit's employees must support the decertification petition before the Board will hold a new representation election. 29 C.F.R. § 101.18.

As the Board has recognized, an independent union may decide to affiliate with a national or international union for diverse reasons. *See Amoco III,* 239 N.L.R.B. at 1195. These include access to an enhanced financial base, greater bargaining expertise, and increased bargaining strength. In the past, an independent union wishing to affiliate would first hold an election among its members according to procedures established in the union's constitution and by-laws. If the members voted to affiliate, the union would then petition the Board to amend the union's certification to designate the newly-affiliated union as the exclusive bargaining representative of the unit under § 9(a). In the absence of a "question concerning representation," the Board would amend the certification. *See* 29 C.F.R. § 102.60(b).

■ Before altering its position in *Amoco IV,* the Board adhered to the following procedure to determine if a "question concerning representation" had arisen. The Board first inquired into whether the affiliation decision was made with sufficient "due process" to ensure that, as a threshold matter, the decision reflected the wishes of the union's members. The Board inquired into whether the affiliation election was "conducted under democratic procedures," with sufficient due process to guarantee that the "election represents the majority view of the *members of the union.*" *NLRB v. Newspapers, Inc.,* 515 F.2d 334, 339 (5th Cir.1975) (emphasis added). The election procedures must not be so "lax" or "substantially irregular" as to "negate the validity of the election." *NLRB v. Commercial Letter, Inc.,* 496

---

5. For example, the Board may be satisfied after a Board-supervised election or after the employer's voluntary acceptance of authorization cards in favor of the union signed by a majority of the unit's employees.

F.2d 35, 42 (8th Cir.1974); *see also NLRB v. Bear Archery*, 587 F.2d 812 (6th Cir. 1977) (enforcement of continuity finding denied because of inadequate due process in election procedures). The due process inquiry has always been used to protect union members' rights in the affiliation decision process.[6]

Once assured that the rights of union members had not been violated, *see, e.g., Amoco III*, 239 N.L.R.B. at 1196, the Board conducted an investigation into whether "continuity of representation" existed between the pre- and post-affiliation union. The continuity inquiry addressed both union members' and non-union members' interests in continued representation by the representative that had been selected by the majority. The Board's inquiry thus focused on whether the union was substantially changed by the affiliation. In the words of the classic formulation of the essential inquiry:

> [T]he right of a successor union to assume the status of a certified bargaining agent held by its predecessor depends on a factual issue—is the new union a continuation of the old union under a new name or affiliation or is it a substantially different organization?

*Carpinteria Lemon Association v. NLRB*, 240 F.2d 554, 557 (9th Cir.1956).[7]

In making its continuity determination, the Board considered such factors as continuation of unit autonomy, retention of local officers, and continuation of established union procedures (such as grievance procedures, voting procedures, and by-laws). *Compare Retail Store Employees Union Local 428 v. NLRB*, 528 F.2d 1225, 1228 (9th Cir.1975) (continuity not found where pre-affiliation union officers no longer participated in actual negotiations over collective bargaining issues with management after affiliation), *with Carpinteria Lemon*, 240 F.2d at 557 (continuity found where only name change occurred), *and Hamilton Tool Co.*, 190 N.L.R.B. 571, 575 (1971) (continuity found where bank accounts, checkoff authorizations, and membership remained the same). So long as continuity existed, the Board considered affiliation decisions as internal union matters that did not necessarily affect the status of the union as the exclusive bargaining representative of its unit.[8]

Thus, the purpose of the due process determination was to protect union members' interests while the purpose of the continuity determination was to protect employees' § 7 and § 9(a) rights by enabling the Board to call a new representation election whenever the affiliation posed a "question concerning representation." Until now, the Board believed that a continuity determination was sufficient to protect employees' § 7 and § 9(a) rights because that process allowed the Board to require a vote, on a case-by-case basis, whenever the Board questioned whether a union's affiliation implicated those rights. When no question regarding due process or representation arose, the Board certified the newly-affiliated union and thus avoided unnecessary interference in a fundamentally internal union matter. Now, however, the Board implies that the continuity determination is inadequate to protect employees' § 7 and § 9(a) rights and that both the due process and continuity inquiries must focus on those rights.

---

**6.** This is the stage where the Board's new rule would have its impact. The procedural difference between the old and the new rule is the requirement of a unit-wide vote as part of the threshold due process inquiry. *See infra* p. 367.

**7.** For an early discussion of the continuity principle, see *NLRB v. Harris-Woodson Co.*, 179 F.2d 720 (4th Cir.1950). Board decisions on this subject include *Jasper Seating Co.*, 231 N.L.R.B. 171 (1977); *Bear Archery, Div. of Victor Comptometer Corp.*, 223 N.L.R.B. 1169 (1976), *en-*

*forcement denied*, 587 F.2d 812 (6th Cir.1977); *Hamilton Tool Co.*, 190 N.L.R.B. 571 (1971); *North Elec. Co.*, 165 N.L.R.B. 88 (1967); and *East Ohio Gas Co.*, 140 N.L.R.B. 1269 (1963).

**8.** There has been a continuing discussion within the Board, however, about whether affiliation decisions are internal union matters. See *Amoco III, Amoco IV, Jasper Seating Co.*, 231 N.L.R.B. 171 (1977), and *North Electric Co.*, 165 N.L.R.B. 88 (1967), for examples of cases with both majority and dissenting views on this point.

## B. Analysis: Why the New Rule Must be Rejected

■ After considering this matter thoroughly, we have concluded that the Board's new rule is irrational and inconsistent with the National Labor Relations Act. At least three reasons compel our conclusion. First, the rule is inconsistent with the long-standing federal labor policy, repeatedly recognized by the Supreme Court, to avoid unnecessary interference in internal union affairs. Second, the rule is inconsistent with the NLRA's primary purpose of promoting industrial peace. Third, the rule is irrational because the Board's existing due process and continuity determination procedures adequately protect employee rights without imposing on union members' rights or otherwise being inconsistent with the NLRA.

### 1. The Rule is Inconsistent with the Policy of Non-interference in Internal Union Matters

The Board's new rule violates the longstanding federal labor policy of avoiding unnecessary interference in internal union affairs.[9] The Supreme Court has repeatedly recognized this policy. See, e.g., NLRB v. Allis-Chalmers Manufacturing Co., 388 U.S. 175, 87 S.Ct. 2001, 18 L.Ed.2d 1123 (1967); see also NLRB v. Boeing Co., 412 U.S. 67, 93 S.Ct. 1952, 36 L.Ed.2d 752 (1973) (Board interference with union rule held unjustified); Scofield v. NLRB, 394 U.S. 423, 89 S.Ct. 1154, 22 L.Ed.2d 385 (1969) (same); cf. United Steelworkers v. Sadlowski, 457 U.S. 102, 102 S.Ct. 2339, 72 L.Ed.2d 707 (1982) (union rule upheld against challenge by employees). These cases convince us that we should reject the Board's rule because it interferes with the conduct of internal union affairs without any countervailing justification.

NLRB v. Allis-Chalmers Mfg. Co., 388 U.S. 175, 87 S.Ct. 2001, 18 L.Ed.2d 1123 (1967), provides perhaps the strongest statement of congressional intent to limit unnecessary interference in internal union affairs. In upholding a union rule that imposed sanctions on union members who crossed a picket line during a strike, the Court explained the structure of the

---

**9.** Although the Board's earlier cases characterize affiliation decisions as internal union matters, the Board now suggests that an affiliation by its very nature always implicates employees' § 7 right to choose their bargaining representative. And, because § 9(a) of the NLRA requires that the exclusive bargaining representative of a unit must be chosen by a majority of the employees in the unit, the Board now suggests that *any* affiliation constitutes a sufficient change in the character of the union to call the initial employee choice of bargaining representative into question. The Board's new position is essentially that affiliations are never simply internal union affairs.

The union, on the other hand, argues that affiliation decisions are entirely internal union matters. The union asserts that federal labor policy precludes Board interference in such decisions. See infra pp. 361–363, & note 15.

As a practical matter, we believe that affiliation decisions are internal union matters that may in some cases have sufficient external ramifications to call non-union members' § 7 and § 9(a) rights into question. Many affiliation decisions work minimal changes; for example, the decision may involve only a name change. See, e.g., Carpinteria Lemon Ass'n v. NLRB, 240 F.2d 554, 557 (9th Cir.1957) (continuity found where only name change occurred). We cannot see how such a change could be anything other than an internal union affair. Some affiliation decisions may have a significant external impact on the § 7 and § 9(a) rights of all employees in the bargaining unit, as, for example, when the local relinquishes its power to call a strike to the international or when the local authorizes the international to select local officers. See, e.g., Retail Store Employees Local 428 v. NLRB, 528 F.2d 1225, 1228 (9th Cir.1975) (continuity not found where pre-affiliation union officers no longer negotiated collective bargaining matters with management: "This leadership change suggests an absence of continuity where it counts, in a bargaining relationship.").

Even when the affiliation decision results in substantial change in the union, the actual decision to affiliate is internal, but the decision's external ramifications could justify the Board's refusal to amend the union's certification. We therefore accept the union's characterization of all affiliation decisions as internal union affairs, and emphasize that the Board is not justified in interfering with such affairs. The Board can justify its interference only *after* the Board has conducted a continuity determination and finds that a "question concerning representation" exists. The Board's proper function is to decide the matter on a case-by-case basis. See infra p. 364 & note 12.

NLRA, and how its majority rule concept is applied:

> National labor policy has been built on the premise that by pooling their economic strength and acting through a labor organization freely chosen by the majority, the employees of an appropriate unit have the most effective means of bargaining for improvements in wages, hours, and working conditions. The policy therefore extinguishes the individual employee's power to order his own relations with his employer and creates a power vested in the chosen representative to act in the interests of all employees .... The employee may disagree with many of the union decisions but is bound by them. *"The majority-rule concept is today unquestionably at the center of our federal labor policy."* "The complete satisfaction of all who are represented is hardly to be expected ...."

388 U.S. at 180, 87 S.Ct. at 2006 (footnotes and citations omitted) (emphasis added). In keeping with this policy, "[a] wide range of reasonableness must be allowed a statutory bargaining representative in serving the unit it represents...." *Id.*

In explaining that an element of the "majority rule concept" reserves union decision-making to union members, the Court added that *"nonunion employees have no voice in the affairs of the union."* 388 U.S. at 191, 87 S.Ct. at 2012 (emphasis added).[10] The affairs of the union are those that relate to the union's self-governance. Congress intended to restrict union self-governance only in very narrow circumstances not present in this case. "Congress did not propose any limitations with respect to the internal affairs of unions, aside from barring enforcement of a union's internal regulations to affect a member's employment status." 388 U.S. at 195, 87 S.Ct. at 2014. "[A] union could fine a member [for breaking a union rule] but that same rule could not be enforced by causing the employer to exclude him from the work force or by affecting his seniority ...." *Scofield v. NLRB,* 394 U.S. at 428, 89 S.Ct. at 1157; *see also United Steelworkers v. Sadlowski,* 457 U.S. at 115–19, 102 S.Ct. at 2347–49 (discussing congressional intent to limit interference in union self-governance). In *Allis-Chalmers,* the Court further examined the legislative history of the NLRA and found that Congress had repeatedly condemned outside interference in internal union affairs. *See, e.g.,* 388 U.S. at 187–95, 87 S.Ct. at 2010–14.

The non-interference policy extends to interference by the Board. When a union rule has not clearly violated a policy of the NLRA, the Court has limited the Board's power to interfere in internal union affairs. *See NLRB v. Boeing,* 412 U.S. at 74–75, 93 S.Ct. at 1956–57 (upholding position that Board lacked power to review reasonableness of union disciplinary rule imposed on members who crossed picket line); *Scofield v. NLRB,* 394 U.S. at 432, 89 S.Ct. at 1159 (upholding union rule, enforceable by fines and expulsion, imposing limitation on immediate pay that members could receive for piecework because Court found no "impairment of statutory labor policy"). Thus, the Court will not allow the Board to interfere with a union rule unless the rule significantly impinges on a policy of the NLRA.

Congress' concern for insulating internal union affairs from unnecessary interference is also found in the Labor-Management Reporting and Disclosure Act of 1959 (Landrum-Griffin Act), 29 U.S.C. §§ 401–531 (1982). The entire focus of the Land-

**10.** The *Amoco IV* dissent emphasizes one reason why affiliation decisions are internal union affairs:

> Any tension between the right of members of the unit to a voice in their representation and the right of members of a union to decide for themselves the future of their union must be resolved in favor of the union membership. It is the union member who is most affected by union affiliation. In contrast, the effect of affiliation on the unit member who has elected not to join the labor organization which represents him is indirect.

*Amoco IV,* 262 N.L.R.B. at 1242. The dissent also aptly points out that non-union members interested in an affiliation decision are free to join the union. *Id.*

rum-Griffin Act is on internal union affairs, with the object of preventing abuses of power as well as racketeering in union management. *See* 29 U.S.C. § 401.[11] In *United Steelworkers v. Sadlowski,* 457 U.S. 102, 102 S.Ct. 2339, 72 L.Ed.2d 707 (1982), the Supreme Court explained:

> Additional evidence that Congress regarded the union's desire to maintain control over its own affairs as legitimate is provided by the history of other sections of the [Landrum-Griffin Act]. In drafting Titles II through VI, Congress was guided by the general principle that unions should be left free to "operate their own affairs, as far as possible." S.Rep. No. 1684, 85th Cong., 2d Sess. 4–5 (1958). It believed that only essential standards should be imposed by legislation, and that in establishing those standards, great care should be taken not to undermine union self-government.... Congress' desire to permit unions to regulate their own affairs and to minimize governmental intervention suggests that it would have endorsed union efforts to reduce outsider influence.

457 U.S. at 117, 102 S.Ct. at 2348 (some citations omitted). In *Sadlowski,* the Court upheld a challenged union rule that prohibited non-union members and non-employees from contributing to union election campaigns, because the rule served "a legitimate purpose that is clearly protected under the statute" even though the rule may have impinged on employee rights to free speech guaranteed by § 101(a)(2) of the Landrum-Griffin Act. 29 U.S.C. § 411(a)(2). *See* 457 U.S. at 115, 102 S.Ct. at 2347.

At a minimum, these cases demonstrate that the policy of non-interference in internal union affairs occupies an important position in the scheme of our national labor laws. Bearing this in mind, we must find

that the Board's new rule is inconsistent with the NLRA because the rule interferes in an internal union decision without sufficient justification. Like the union rules in the cases discussed above in which the Court barred Board interference, the affiliation decision process is an internal union matter. And, like the Court in those cases, we find that the union practice—limiting affiliation decisions to union members— does not impair a statutory labor policy.

The new rule, on the other hand, will result in interference in internal union affairs by non-members, employers (through refusals to bargain), and the Board. The new rule mandates that a continuity determination may not be conducted until after a unit-wide vote is taken. *See Amoco IV,* 262 N.L.R.B. at 1241 n. 7. This puts the cart before the horse. Only *after* the Board conducts a continuity determination and finds a "question concerning representation" can the Board justify its intervention.[12] Under the new rule, by requiring a unit-wide vote even when continuity exists between a pre- and post-affiliation union, the Board inevitably interferes in internal union affairs without justification. In those cases, no "impairment of a statutory labor policy" (here the protection of employees' § 7 and § 9(a) rights) can justify the Board's intervention. *See Scofield v. NLRB,* 394 U.S. at 432, 89 S.Ct. at 1159.

## 2. *The New Rule is Inconsistent with the Policy of Promoting Stability in the Bargaining Representative*

The Board's new rule is also inconsistent with the strong national policy of maintaining stability in the bargaining representative to achieve the NLRA's primary purpose—preserving industrial peace. 29 U.S.C. § 151 (1982); *see NLRB v. Silver Spur Casino,* 623 F.2d 571, 578 (9th Cir.

---

**11.** Scc *Silkwood v. Kerr-McGee Corp.,* 464 U.S. 238, 104 S.Ct. 615, 622–26, 78 L.Ed.2d 443 (1984), and *Chevron U.S.A., Inc. v. Hammond,* 726 F.2d 483, 489–95 (9th Cir.1984), for examples of the examination of the legislative history of one act to ascertain congressional intent in another act in the same statutory scheme.

**12.** We are not called upon to decide which changes resulting from an affiliation justify the Board in finding a "question concerning representation." Such factual decisions must be reviewed for substantial evidence on a case-by-case basis. *Retail Store Employees Local 428,* 528 F.2d at 1227.

1980), *cert. denied,* 451 U.S. 906, 101 S.Ct. 1973, 68 L.Ed.2d 294 (1981). In *Silver Spur* we explained:

> The most valued objective of the Act is industrial peace.... [T]he Board [has determined] that industrial peace is more likely to be achieved by maintaining continuity in the bargaining structure.... [T]he Board has favored continuity in the bargaining structure over the enhancement of employee free choice.

623 F.2d 578.

The policy of preserving stability in the bargaining structure even at some expense to employee free choice is manifested throughout the intricate web of rules the Board has constructed through years of overseeing national labor relations. To take just three examples, this policy is reflected in (1) employer refusal-to-bargain cases, (2) § 9(c)'s decertification procedures, and (3) the contract-bar rule.

First, in employer refusal-to-bargain cases, unions are accorded several presumptions of majority status. After initial certification by the Board, a union enjoys an irrebuttable presumption of majority status for one year, and a rebuttable presumption thereafter, even in the absence of a contract. *Brooks v. NLRB,* 348 U.S. 96, 75 S.Ct. 176, 99 L.Ed. 125 (1954); *NLRB v. Top Manufacturing Co.,* 594 F.2d 223, 224 (9th Cir.1979); *Pioneer Inn Associates v. NLRB,* 578 F.2d 835, 838 (9th Cir.1978). To rebut the presumption, an employer must demonstrate a good faith belief that a certified union lacks majority status. *See Silver Spur,* 623 F.2d at 578–79; *Pioneer Inn,* 578 F.2d at 839–41; *see also NLRB v. Tahoe Nugget, Inc.,* 584 F.2d 293, 301–02 (9th Cir.1978) ("[T]he threat to industrial peace must be counter-balanced by good cause."). This is not an easy showing for an employer to make. *See* 1 C. Morris, *The Developing Labor Law* 540–49 (2d ed. 1983). The presumptions restrict the opportunities to challenge a certified bargaining representative's majority status.

Second, under its decertification procedures, the Board will consider decertification only if a sizable percentage—30%—of the employees present a petition, 29 C.F.R. § 101.18, or in "extreme cases," R. Gorman, *Basic Text on Labor Law* 49–50 (1976) ("extreme cases" occur when a union has been discriminating on the basis of race or any other impermissible basis). Decertification requires a strong showing of employee dissatisfaction or other "extreme" justification. In this case, the Board's new rule effectively decertifies the newly-affiliated union before any inquiry is conducted into the character of the union or its support among employees. This result runs completely counter to the policy of promoting stability in the bargaining representative.

Third, under the contract-bar rule,

> the Board refuses to conduct decertification elections—whether requested by the employer, employees, or another union— during the life of the contract. *Hexton Furniture Co.,* 111 NLRB 342, 344 (1955). The rule was adopted to protect the bargaining atmosphere, *id.,* and is applied *even if a majority of the employees withdraw their support.*

*Pioneer Inn,* 578 F.2d at 838 (emphasis added). To "protect the bargaining atmosphere," the contract-bar rule limits the occasions when the Board will consider challenges to a certified bargaining representative's majority status. The Board here, as was true of the employer in *Pioneer Inn,* "does not seek a decertification election, [but instead] seeks the same result by professing a doubt of majority status" without complying with the strict requirements for decertification. *Id.*

The Board's new approach seriously undermines the stability objectives protected by the contract-bar rule. For example, in the *Amoco* cases, the employer unilaterally cancelled the current contract when notified that the bargaining representative had affiliated with another union despite the fact that the contract did not expire for another 17 months. *See Amoco Production Co. v. NLRB,* 613 F.2d at 109. The employer argued that it need not recognize the contract nor bargain with the newly-affiliated union until a new unit-wide repre-

sentation election was held. Although the Board has repeatedly and properly found such conduct to violate the NLRA, *see Amoco III*, 239 N.L.R.B. 1195, 1196 (1979); *Amoco Production Co. (Amoco II)*, 233 N.L.R.B. 158, 161–62 (1977); *Amoco Production Co. (Amoco I)*, 220 N.L.R.B. 861, 865 (1975), this unlawful conduct is condoned under the Board's new rule. *Amoco IV*, 262 N.L.R.B. 1240 (1982).

These rules illustrate that the Board cannot interfere with the certified bargaining representative's status without just cause. Congress and the Board have determined as a matter of national labor policy that bargaining stability and the principle of majority rule may limit the timing of employee challenges to their certified bargaining representative's majority status. Because it effectively decertifies a union before the Board can establish any basis for a union's loss of majority status, the new rule is inconsistent with this national labor policy.

### 3. *In Light of Effective Longstanding Procedures, it is Irrational to Adopt the New Rule*

The Board's rule is irrational for at least two reasons.[13] First, the rule is unnecessary to protect legitimate employee interests because the existing due process and continuity procedures adequately protect those interests. Second, the Board's reasoning does not support the rule.

#### (a) *Existing procedures adequately protect employee interests and are consistent with federal labor policy*

The Board's previously-followed due process and continuity determination procedures adequately protected the critical rights of employees to be represented by a union selected by a majority of employees in the unit while also protecting union members' rights to run their internal affairs free from unnecessary outside intervention. The procedure allowed the Board to require a post-affiliation representation election on a case-by-case basis if a "question concerning representation" arose. Where no question arose because the affiliation resulted in an insubstantial change in the certified bargaining representative, the Board recognized the change as a purely internal union matter and amended the certification of the newly-affiliated union without a unit-wide election. It is irrational to discard an effective procedure that neither (1) unnecessarily interferes in internal union affairs, (2) unnecessarily destabilizes the bargaining representative, nor (3) unnecessarily discourages the legitimate decision of independent unions to affiliate, in favor of a new procedure that presents all of those risks.

Moreover, we have previously recognized that the existence of adequate safeguards to protect employees' § 7 and § 9(a) rights obviates the need for alternate protective actions. For example, in *Silver Spur*, the employer refused to bargain with the certified bargaining representative and claimed that the union no longer enjoyed majority status. In rejecting the employer's claim that the refusal to bargain was in the interest of protecting employees' § 7 and § 9(a) rights, we noted that if a majority of employees in a bargaining unit no longer supported the union, they could seek the union's decertification. 623 F.2d at 578.[14] Here, the Board's continuity determination protects employees' § 7 and § 9(a) rights, and the employees' right to petition for decertification remains an additional and viable option for employees genuinely disgruntled by a union's affiliation decision.

#### (b) *The Board's opinion does not justify its rule*

The Board's opinion asserts that the new rule is needed to preserve "fundamental denials of representation in some cases where a majority of all unit employees unquestionably desire affiliation.

---

13. For additional criticism along these lines, see Hale, *Union Affiliations: Examination of the Governing NLRA Standards*, 3 Det.C.L.Rev. 709, 732–37 (1983). Hale argues convincingly that the Board's rule is not based on any statutory authority and that it will lead to temporary

14. *See supra* pp. 359–360.

due process rights" for all employees. 265 N.L.R.B. No. 55, slip op. at p. 3. We must assume that the Board also bases its changed rule on a concern for employees' § 7 and § 9(a) rights. The Board's reasoning is flawed on both of these grounds; we have already demonstrated the error in the Board's reliance on the latter ground.

The Board's opinion specifically casts the new rule as a modification of the Board's traditional "due process" inquiry.[15] This approach is unpersuasive. The "due process" inquiry has always been aimed at assuring that democratic voting *procedures* are observed in affiliation elections to protect union members' rights to manage their internal affairs and to be represented by the organization of their choice. *See NLRB v. Newspapers, Inc.*, 515 F.2d 334, 339 (5th Cir.1975) ("principle question is whether in fact the election represents the majority view of the members of the union"). For example, the Board has required the use of secret ballots to avoid any possibility of coercion. By placing the new rule in the context of the "due process" inquiry, the Board avoids considering its legitimate and appropriate inquiry: does the affiliation decision harm non-members' § 7 and § 9(a) interests?

As a practical matter, applying the new rule at the "due process" inquiry stage of the Board's certification amendment procedure makes little sense. The Board's new rule makes the required unit-wide vote a prerequisite for the Board's conducting a continuity determination. The new rule's insertion of a unit-wide vote at this stage of the affiliation process results in duplicative procedures. Under the Board's new rule, a union would first put the affiliation question to a unit-wide vote of union and non-union employees. If the unit voted affirmatively, the union members could then vote to affiliate. Once the union voted to affiliate and asked the Board to amend the union's certification, the Board would still step in and conduct a continuity determination. Despite the fact that a majority of the unit, union and non-union employees combined, had already voted affirmatively on the affiliation question, the Board would nonetheless call a formal unit-wide representation election if the Board found that the post-affiliation union was substantially different from the pre-affiliation union. Despite the Board's protestation at oral argument that the two unit-wide votes would differ in their formality, we believe that the process is unreasonably duplicative.

The Board also states that a pre-affiliation unit-wide vote is essential to maintain the integrity of the Board's certification and election procedures. This assertion is also unpersuasive. Its earlier continuity determination process allowed the Board to call for a Board-supervised election whenever the Board found a "question concerning representation." The Board's new rule merely requires an informal, non-Board-supervised election in pre-affiliation decisions. We fail to see how imposing a non-Board-supervised election, even when no representation question arises, enhances the integrity of the Board's certification and election procedures.[16]

## CONCLUSION

The Board's new rule is inconsistent with federal labor policy because it unnecessari-

---

15. *See supra* p. 360 & note 6. The union contends that there is no rational basis at all for any "due process" inquiry by the Board. We disagree. With regard to the "due process" inquiry, we hold only that the unit-wide vote is not an appropriate part of that inquiry.

16. The Board, in its brief, also seeks to support its decision by arguing that the union in this case was substantially changed by its affiliation. The Board appears to be supporting its new rule, at least in part, by arguing that continuity might not be found in this case anyway. As the

U.S. Chamber of Commerce's amicus brief cogently explains, however, the Board's opinion involves no factual analysis and treats the issue exclusively as a matter of law. We must therefore review the decision as a matter of law. *See supra* note 4.

In any event, the facts of this case could not justify the Board's new rule because the rule would also apply to situations in which 90% of the unit employees are union members and all of them vote for affiliation.

ly interferes with internal union affairs and bargaining structure stability. Such interference is irrational because the Board's prior case-by-case approach adequately protects employees' § 7 and § 9(a) rights without such interference. The Board's new rule is therefore neither consistent with the NLRA's purposes nor rational.

Accordingly, we GRANT the union's petition for review and REMAND the matter to the Board for further proceedings consistent with this opinion.

EUGENE A. WRIGHT, Circuit Judge, dissenting:

The National Labor Relations Board has decided that a union affiliation election does not satisfy the requirements of due process if nonmembers are ineligible to vote. *Amoco Production Co.*, 262 N.L.R.B. 1240 (1982). I do not find that position irrational or inconsistent with the National Labor Relations Act, 29 U.S.C. §§ 151–169, and would affirm. *See Beth Israel Hospital v. NLRB*, 437 U.S. 483, 501, 98 S.Ct. 2463, 2473, 57 L.Ed.2d 370 (1978).

The Fifth Circuit has enforced the Board's rule. *Local No. 4–14, Oil, Chemical & Atomic Workers International Union v. NLRB*, 721 F.2d 150 (5th Cir.1983). It identifies "the crux of the Board's reasoning":

"If the Board is to accept privately conducted elections as a basis for amending Board certifications, it should be certain that minimal standards of due process be observed lest the very validity of Board certifications and elections be undermined. Granted that employees in a bargaining unit cannot be compelled to vote, they can, at the very least, be afforded *the opportunity to vote*. It appears basic to the collective-bargaining process that the selection of a bargaining representative be made by the employees in the bargaining unit. In our view, therefore, a cardinal prerequisite to any change in designation of the bargaining representative is *that all employees* in the bargaining unit be afforded the opportunity to participate in such selection."

*Id.* at 152 n. 2 (quoting *Amoco Production*, 262 N.L.R.B. at 1241 (quoting *North Electric Co.*, 165 N.L.R.B. 942, 944 (1967) (dissent))).

The Fifth Circuit noted that "[s]trong arguments" for the contrary rule "were adopted by the Board in its earlier rulings that were overruled" by the new ruling. *Id.* at 152. It concluded that "Although the Board earlier vacilated [sic] somewhat in establishing a rule …, [it] clearly articulated reasonable grounds for this later change." *Id.*

The court stated:

[W]e are unable to say that the general ruling that now requires the participation of nonunion members in an affiliation election is irrational or inconsistent with the Act, or that it is beyond the wide discretion of the Board to establish procedures in an affiliation election that will ensure the fair and free choice of the bargaining representative of all the employees.

*Local Union No. 4–14*, 721 F.2d at 152–53. I agree. That one circuit already has concluded that the Board's position is rational reinforces my position. An intercircuit conflict over the rationality of the Board's decision is unwarranted.

The majority explains at length its reasons for reaching the opposite conclusion. It engages in the balancing of interests that is the province of the Board, not the courts.

First, does the new rule unnecessarily interfere with internal union affairs? The Board has concluded that an affiliation election is not an internal union affair, but involves the selection of a bargaining representative. *Amoco Production*, 262 N.L.R.B. at 1241. While the Board has presumed in the past that an affiliation election was an internal union affair unless a question concerning continuity of representation arose, it may change its application of the Act "in light of its cumulative expe-

rience." *Beth Israel Hospital,* 437 U.S. at 508, 98 S.Ct. at 2477.

The Board has concluded that affiliation election voting rights for nonmembers are necessary to preserve their right to participate in the selection of a bargaining representative. *See* 29 U.S.C. § 157. The bargaining unit here consists of about 4800 employees, of which 2824 are union members. Only 1206 member employees voted for affiliation; 774 voted against it.

The majority opinion concludes that requiring participation of nonmembers constitutes an unwarranted interference with internal union affairs. While the majority may give the preservation of union autonomy higher priority, we are required to defer to the Board's expertise. *See NLRB v. Walton Mfg. Co.,* 369 U.S. 404, 405, 82 S.Ct. 853, 854, 7 L.Ed.2d 829 (1962); *Texaco, Inc. v. NLRB,* 700 F.2d 1039, 1042–43 (5th Cir.1983). The Board need only justify its position within the statutory framework. *Beth Israel Hospital,* 437 U.S. at 501, 98 S.Ct. at 2473; *Local Union No. 4–14,* 721 F.2d at 152.

Second, is the Board's rule inconsistent with the promotion of stability in the bargaining representative? The majority opinion states that this is a situation in which the promotion of stability of the bargaining representative should prevail over individual employees' rights to free choice. A change in affiliation is a change in the status of the bargaining representative. Under the new rule, nonmembers may not force affiliation because the decision to hold an affiliation election remains the province of the union. The Board's rule will promote stability more effectively than did its former position.

Third, is the Board's new rule irrational? The majority contends that irrationality is established by the adequacy of the old procedure and the inadequacy of the Board's reasoning.

The adequacy of the old procedure is irrelevant. We should instead determine whether the new rule is rational and consistent with the Act. The merit or suffi-

ciency of the previous rule should not control.

The majority lists risks that it considers created unnecessarily by the change in procedure. I would defer to the Board's conclusions as to the necessity of the new rule. Those risks each identify a policy, the protection of which is discussed elsewhere in this opinion.

The Board has not avoided the appropriate statutory inquiry. It has decided that the right of nonmembers to select their bargaining representative will be protected adequately only if they may participate in affiliation decisions. Therefore, due process fairness and the integrity of the certification process require the right to participate in affiliation elections.

I would affirm.